ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN and Brotherhood of Railroad Trainmen, Appellants,

v.

SWITCHMEN'S UNION OF NORTH AMERICA et al., Appellees.

No. 17588.

United States Court of Appeals
Fifth Circuit.

June 30, 1959.

Rehearing Denied Aug. 10, 1959.

Benning M. Grice, Macon, Ga., V. C. Shuttleworth, Harry Wilmarth, Cedar Rapids, Iowa, Wayland K. Sullivan, Cleveland, Ohio, for appellants.

Julian C. Sipple, Ralph L. Crawford, John R. Calhoun, John B. Miller, Savannah, Ga., for appellee, Central of Georgia Ry. Co.

Before JONES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The case arises under the Railway Labor Act, 45 U.S.C.A. §§ 151–163.[1] Specifically, the question is whether a contract between the Railroad and SUNA for yard work at certain Georgia stations is invalid because the Railroad failed to give a Section 6 notice, 45 U.S.C.A. § 156, to BRT and ORCB.[2]

In a consolidated proceeding the District Court held the SUNA contract valid. BRT and ORCB appeal, contending that the agreement is invalid and its enforcement should have been enjoined. Admittedly no Section 6 notice[3] was given by the Railroad to BRT or ORCB, and, if required, the contract is invalid,[4] leaving the prior agreements (or prac-

---

1. The Railway Labor Act, found at Section 151–163 of 45 U.S.C., 45 U.S.C.A., was originally enacted in 1926, 44 Stat. 577, and has, of course, undergone occasional amendment since that time. Sections 181–188 generally apply the Act to carriers by air. The original section numbers, which have been used throughout this opinion, have been carried into the Code in a 150 series, e. g., § 1 is 45 U.S.C.A. § 151, § 6 is § 156, etc., and may be readily found in that way. However, the sections of the Act possess the unfortunate, and somewhat distinctive, characteristic of having their subsections designated by ordinal numbers, e. g., § 151–Fifth, § 152–Eleventh, etc., rather than, e. g., § 151(5), or § 151(e), § 152(11), or § 152(k). Nevertheless, we have retained this statutory scheme throughout the opinion, too.

2. The parties are:
Railroad: Central of Georgia Railway Company
SUNA: Switchmen's Union of North America
BRT: Brotherhood of Railroad Trainmen
ORCB: Order of Railway Conductors and Brakemen

3. Section 6, 45 U.S.C.A. § 156, provides: "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

4. Brotherhood of Locomotive Firemen and Enginemen v. Chicago N.S. & M. R.R., 7 Cir., 1945, 147 F.2d 723, certiorari denied 325 U.S. 852, 65 S.Ct. 1089, 89 L.Ed. 1973; Burke v. Morphy, 2 Cir., 1940, 109 F.2d 572, certiorari denied 310 U.S. 635, 60 S.Ct. 1078, 84 L.Ed. 1404; Railroad Yardmasters of America v. Pennsylvania R., 3 Cir., 1955, 224 F. 2d 226; Rolfes Dwellingham, 8 Cir., 1952, 198 F.2d 591.

tices) in effect. All are in agreement, with which we concur, that the case poses a genuine issue as to validity, not interpretation, so that on these and other authorities, it is one for judicial consideration.[5]

## I.

### The Bargaining Representative

The case comes into being primarily because there was a change in 1956 in the bargaining representative for yard work (switching and foremen). Prior to that time BRT was the bargaining agent. In 1956, the Mediation Board conducted an election, Section 2-Ninth, 45 U.S.C.A. § 152-Ninth,[6] as a result of which SUNA was certified as having "been duly designated and authorized to represent, for the purposes of the Railway Labor Act, the craft or class of Yardmen (Foremen, Switchmen), employees of the Central of

Georgia Railway Company, its successors and assigns." [7]

## II.

### The Work in Dispute

The 1958 SUNA contract at issue here involves yard work at Rome, Cedartown, Griffin and Athens, Georgia. Prior to the 1956 certification of SUNA, and during the BRT representation, the agreements with the Railroad gave substantial rights to *roadmen* (conductors and brakemen) to do yard work at these locations.[8] In brief, under these agreements or practices roadmen perform yard work in accordance with their relative standing on the *road* seniority rosters. The senior man on the *road* list has priority over the junior man to do the *yard* work, but he does not acquire any *yard* seniority in doing it.

5. Virginian Ry. Co. v. System Federation No. 40 AFL, 1937, 300 U.S. 515, 545, note 3, 57 S.Ct. 592, 81 L.Ed. 789; Steele v. Louisville & N. R., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L. Ed. 1283; Mount v. Grand Int'l Brotherhood of Locomotive Engineers, 6 Cir., 1955, 226 F.2d 604, certiorari denied 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed. 839; Brotherhood of Railroad Trainmen v. Smith, 6 Cir., 1958, 251 F.2d 282, certiorari denied 356 U.S. 937, 78 S.Ct. 778, 2 L.Ed.2d 812; Pellicer v. Brotherhood of Railway and Steamship Clerks, D.C.S.D. Fla.1953, 118 F.Supp. 254, affirmed, 5 Cir., 1954, 217 F.2d 205; Hettenbaugh v. Airline Pilots Ass'n Int'l, 5 Cir., 1951, 189 F.2d 319; Alabaugh v. Baltimore & O. R., 4 Cir., 1955, 222 F.2d 861, certiorari denied 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748.

6. Section 2 (§ 152)-Ninth provides that it shall be the duty of the Mediation Board to certify the organizations that have been designated and authorized to represent the employees. The certification by the Mediation Board is not judicially reviewable. Switchmen's Union of North America v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61. Of critical importance in this case is this provision of the section:

"* * * Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. * * *."

7. Section 1 (§ 151)-Sixth states:
"The term 'representative' means any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them."

8. Rome: Contract of September 10, 1952, between ORCB, BRT and Railroad; roadmen do that work, road conductors filling foremen's jobs and road trainmen filling switchmen's job. Assignment is in accordance with their standings on the respective conductors' and trainmen's *road seniority* rosters. No *yard* seniority is accumulated but right to that work is based upon *road* seniority.
Cedartown: 1946 agreement between BRT and Railroad similar to Rome. By practice it applies to conductors as well. Yard work is assigned on the basis of *road* seniority; but no *yard* seniority has accumulated.
Athens: Contract August 1, 1952, between BRT and Railroad. This covers performance of *extra* yard work but regular yard duties have been by custom and practice performed by such road trainmen.
Griffin: Substantially the same as Athens.

## III.

### The New Bargaining Representative Seeks Change

After SUNA's 1956 certification it sought to change the contracts as to these locations. In the fall of 1956 the Railroad gave, but later withdrew, a Section 6 (§ 156) notice to BRT and ORCB. Subsequently when conferences seemed to be unavailing, SUNA in 1958 gave the Railroad notice of a strike which precipitated the mediation machinery of the Act. As a result of this mediation, conducted by the Mediation Board with SUNA and Railroad only,[9] the 1958 SUNA agreement attacked here, was reached.

The 1958 agreement gave this yard work to yardmen only. Roadmen (numbering 12 men) then doing yard work were given an election to become yardmen. But if the election was accepted, they had to retire from road work. Appellants' brief describes this as a Hobson's choice. "Thus, those presently in the yard who 'elect' to become exclusive *yardmen* must give up their *road* seniority and those who 'elect' to become exclusive *roadmen* must surrender their right to work in the *yard* in accordance with their road seniority standing." As to roadmen not presently doing yard work, full or part time, no right to "elect" to become yardmen was extended. These men, totaling approximately 175 were, however, actually affected since the others (numbering 12 men) exercising their election to do road work and abandon yard work, would "roll," "pull" or "bump" roadmen engaged in road work junior to them on the road seniority.

## IV.

### SUNA's Exclusive Right to Bargain

BRT and ORCB do not contend that the prior agreements (or practices) were perpetual. On the contrary, they recognize, as the written agreements expressly stated, and as the Act implies in any case, 45 U.S.C.A. § 152-Eighth, that each agreement would remain in effect subject to the provisions of the Railway Labor Act. SUNA, succeeding as bargaining representative, succeeded BRT in the administration of these contracts. As successor bargaining agent, it could change them, but until changed, they would remain in effect. And, decisive here, SUNA and the Railroad knew that change was forbidden [10] unless Section 6 was satisfied.

In assaying the attack on the contract, we think it vital to emphasize the right to bargain as it bears on the necessity for Section 6 (§ 156) notice. After certification the only "representative" with whom the Railroad may bargain and make a contract is SUNA. Brotherhood of Railroad Trainmen v. Smith, 6 Cir., 1958, 251 F.2d 282, certiorari denied 356 U.S. 937, 78 S.Ct. 778, 2 L.Ed.2d 812; Switchmen's Union of North America v. Southern Pacific Co., 9 Cir., 1958, 253 F.2d 81. Once certified, it is the exclusive bargaining agent [11] for members of

---

9. The Railroad sought to persuade the Mediation Board to invite BRT and ORCB to attend these negotiations. The Board declined apparently because such delegates could serve no useful function.

10. Section 2 (§ 152)-Seventh provides:
 "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 [6] of this title." A violation of Section 2 (§ 152)-Seventh, which in turn requires compliance with Section 6 (§ 156) is a criminal offense under Section 2 (§ 152)-Tenth.

11. Section 2 (§ 152)-Fourth provides that:
 "The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter."
 Section 2 (§ 152)-Second provides:
 "All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute."

that class or craft. The effect of Section 2-Ninth, 45 U.S.C.A. § 152-Ninth, note 6, supra, is that it has "commanded the carrier to treat with the representative so certified" and " * * * requires the employer to meet and confer with the authorized representative of its employees" and secures "settlement of labor disputes * * * by preventing * * * bargaining with any who do not represent them * * *" the result being that the Act " * * * imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other." Virginian Ry. Co. v. System Federation No. 40 AFL, 1937, 300 U.S. 515, 546, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789, supra.

 Of course, the craft or class represented is to be determined on functional and operational lines, not by the normal activity of the members of a labor union some of whose members may do some or all of the work in question. This is graphically illustrated by the cases arising under the 1954 Union Shop Amendments, Section 2-Eleventh, 45 U.S.C.A. § 152-Eleventh, as to which both the Ninth and Sixth Circuits have held that a union whose members perform work of another craft for which another union has been certificated, cannot legally negotiate with the railroad for its own members. And any such contract, if made, is illegal and unenforceable. Brotherhood of Railroad Trainmen v. Smith, 6 Cir., 1958, 251 F.2d 282, certiorari denied 356 U.S. 937, 78 S.Ct. 778, 2 L.Ed.2d 812 (trainmen, members of BRT, doing conductor work and having seniority of a conductor); Switchmen's Union of North America v. Southern Pacific Co., 9 Cir., 1958, 253 F.2d 81 (trainmen, members of BRT, doing yard work may be affected only by contract with SUNA, the yardmen's certified bargaining agent).

██ Consequently, while under the pre-1956 practice, the right of given individuals to perform yard work may depend on road seniority, the work in question is that of yard work, i. e., that done by switchmen and foremen generally. As to that work, SUNA alone may bargain. When and as it bargains, it may do nothing which alters or disturbs road work—activities wholly within the bargaining prerogative of the other unions—but it may affect those who, while generally roadmen, perform yard work, full or part time. The impact though, is not by reason of road work, or road status, road seniority, or membership in a road union. It is simply that in order to perform yard work—a matter within SUNA's exclusive prerogative— the persons must meet the qualifications prescribed in the yard contract. What that contract shall be, what its terms shall be, is a matter wholly between the carrier and the certified bargaining agent for that type of work. Others may claim to be entitled to notice, but they cannot bargain, and they do not have the right to set in train the successive statutory machinery of mediation.

The inevitable necessity for this is inescapably demonstrated by the context of this record. If, because its members have previously been permitted to do yard work, BRT may now confer, negotiate and bargain with the carrier to assure continuation of such work or any other supposed fair share of it, the ORCB may do likewise. Since there can be no real bargaining if it is not intended that a contract result, a right in BRT and ORCB to bargain would necessarily require that each could make a contract specifying for its members how much and what part of the yard work they would perform, and at what pay and on what terms. SUNA could, of course, do likewise. By the sheer fact that 100% is the maximum that can be made of a whole, to whatever extent BRT's contract, and that of ORCB, covered a percentage of the allocable and available yard work, SUNA would not be making a contract. Indeed, it would not be bargaining. And to that extent it would not be the exclusive bargaining agent for all, whether members of SUNA, BRT, ORCB, or just plain nonunion workers.

If the statutory investment of exclusive bargaining power in the Union certi-

fied by the Mediation Board, note 6, supra, can be whittled down for a labor union which has lost its certified status, then those individuals who decline to belong to any union, or who belong to another labor organization meeting the requirements of a union shop, 45 U.S.C.A. § 152-Eleventh, are likewise entitled to notice and the right to confer and bargain.

■ Then would we indeed have chaos, and the bargaining table to determine labor matters in railroad operations would degenerate into a tower of Babel controversy on *who* was to do the *talking*. That controversy is, of course, committed to the sole and exclusive resolution of the Mediation Board. Switchmen's Union of North America v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61.

We are, therefore, firm that SUNA was the exclusive bargaining agent covering the yard work. It represented all who did the work whether they were members of SUNA, BRT, ORCB or members either of no union or one satisfying a union shop.

### V.

### Section 6 Notice Not Required

■ We are equally firm that under these circumstances BRT and ORCB were not entitled to a Section 6 (§ 156) notice. The emphasis by them of the use of plurals in the Section's reference to carriers and representatives and parties interested in such intended changes is misplaced. This was but a recognition by Congress that in the history of railroad labor problems, the threat to the public interest came frequently from system-wide or nationwide strike threats of several crafts or brotherhoods. It was also a recognition of the fact in railroad life that men float from one craft to another while belonging to but one union. Pennsylvania R. Co. v. Rychlik, 1957, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480. Such language was to provide nothing more than a notice *by* whatever carrier or carriers proposed a change, or whatever craft union or unions proposed a change. Conversely, the notice *by* such party or parties was to be given *to* the carrier or carriers to be affected or to the craft union or unions having the bargaining authority for the work actually involved in the proposed changes.

■ An analysis of the bargaining process refutes the idea that the "parties interested in such intended changes" would or could include all those persons who might be affected by the changes or the unions of which they were members. That the notice requirement is directly related to bargaining as such is shown by the very words of Section 6, note 3, supra, compelling "Notice of an intended change in agreements affecting *rates of pay, rules, or working conditions* * * *.*" The words emphasized by us are a shorthand abbreviation of labor bargaining.

By both Virginian Ry. Co. v. System Federation No. 40, AFL, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, supra, and Switchmen's Union of North America v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61, supra, we are told that the source of friction which was the complete stumbling block to industrial railroad peace was controversy over *who* was to bargain. To eliminate that Congress, in Section 2 (§ 152)-Ninth, provided that the Mediation Board would determine and certify the bargaining agent. And, as pointed out above, upon that certification the carrier was to *treat* with that representative and no other. To treat is to bargain. It is this process of bargaining which the Court describes in its analysis of the term to "treat with." "The command to the employer to 'treat with' the authorized representative of the employees adds nothing to the 1926 act, unless it requires some affirmative act on the part of the employer * * *. The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose dif-

ferences—in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by section 2, First." Virginian Ry. Co. v. System Federation No. 40 AFL, 1937, 300 U.S. 515, 547–548, 57 S.Ct. 592, 599, 81 L.Ed. 789, supra.

Since the carrier is enjoined to "treat," i. e., bargain, only with the certified representative, the question arises—of what use is the notice to those not permitted to negotiate and confer? If a recently displaced union is entitled to be present, what may it do? Under the Act it may not negotiate, for that is left exclusively to the certified agent.

■ If a displaced union is entitled to notice merely to sit and observe because the interest of its members in doing the work of another craft might be adversely affected, would not the same right exist in each and every individual not a member of any union, or a member of some other union satisfying a union shop? Here we are back to chaos. Chaos not only in the attempted negotiations, but in the administrative machinery for notification, the place and time of meeting, and the like.

In McMullans v. Kansas, O. & G. Ry., 10 Cir., 1956, 229 F.2d 50, the plaintiff engineers included those who were members of the certified bargaining brotherhood and others who were members of another union since displaced. They attacked the validity of a contract made by the bargaining agent which had the effect of compulsory retirement for age as to them. The Court rejected the contention that the agreement was invalid because the required notice was not given. "The bargaining agent is the representative of the craft and is not required to consult with the individual members or to give them notice of contemplated contractual actions within the scope of its authority. It has the authority to bind its principal, if it acts within the statutory provisions. * * * Obviously [Section 6] is not intended as a restriction of the bargaining agent or a requirement of personal notice to employees. Its purpose is to fix

a procedure for the commencement of conferences between representatives of the two parties if changes are to be made in the contract." 229 F.2d 50, at page 56.

If the individual affected has no right to notice, to negotiate, to confer, hence to bargain, then his union has no greater right. For as to actual work of a kind committed to another craft, such uncertified union not only may not, it cannot, legally negotiate for its members. Brotherhood of Railroad Trainmen v. Smith, 6 Cir., 1958, 251 F.2d 282, 287; Switchmen's Union of North America v. Southern Pacific, 9 Cir., 1958, 253 F.2d 81, 84.

Section 6 is a part of a carefully designed mechanism to effectuate the purpose of Congress to permit railroad laborers doing particular work to choose their own representative freely, to have the bargaining done for all such workers, whether members or not, by the elected, certified agent, and to supply the governmental machinery of mediation between such adversaries. Notice by one to the other prohibits *unilateral* changes. But it does not—it was not meant to—weaken or detract from the authority or responsibility of the certified agent to speak with a clear and final voice on behalf of all who do that actual work.

To sustain this contention of BRT and ORCB would be for us to hold that while they were not entitled to confer, to discuss, to negotiate, to bargain with the carrier, they were entitled to know that the duly elected and certified bargaining agent for all yard workers was considering a change. Of course, the act of certification gave the new bargaining agent that power and duty. BRT and ORCB were charged with knowledge of that. They were not entitled to further notice so they could circumscribe or direct or control the negotiations of the agent which their own members had, in the eyes of the law, selected.

Since they could perform no proper function in the negotiations of which they could not be a part, the absence of BRT and ORCB from the negotiations

and the failure of the Railroad to give them notice cannot have made the contract invalid. In the limited role which the judiciary plays in these railroad labor disputes, the District Court was right.

Affirmed.