SOUTHERN RAILWAY COMPANY et al.

v.

BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al.

Civ. A. Nos. 1698–1703, 1764–1769, 1777.

United States District Court
M. D. Georgia,
Macon Division.

July 20, 1962.

Charles J. Bloch, Ellsworth Hall, Jr., Macon, Ga., Edgar A. Neely, Jr., Atlanta, Ga., O. Winston Cameron, Meridian, Miss., Burton A. Zorn, New York City, for plaintiffs.

David L. Mincey, Macon, Ga., Milton Kramer, Washington, D. C., C. E. Gregory, Jr., Atlanta, Ga., for defendants.

BOOTLE, Chief Judge.

*Findings of Fact*

1. The plaintiffs are corporations which are carriers by railroad engaged in interstate commerce, are "carriers" as defined in the Interstate Commerce Act and Railway Labor Act, and are subject to the provisions of those acts. Collectively the plaintiffs are known as the Southern Railway System.

2. The defendants are incorporated and unincorporated associations which are the duly designated and authorized collective bargaining representatives of classes of employees of the Southern Railway System and officers or members of such associations.

3. Six of these thirteen actions were commenced in this Court. The others were originally filed in United States District Courts for other districts, but on joint motion of the parties, pursuant to stipulation approved by this court, were transferred by orders of said other courts to this court. After said transfers the thirteen cases were consolidated for trial, and came on regularly for trial after the overruling of plaintiffs' motion for summary judgment.

4. The plaintiffs and the defendants have from time to time in the past, pursuant to the provisions of the Railway Labor Act, met, treated, and bargained concerning rates of pay, rules, and working conditions applicable to employees represented by the defendant labor unions.

5. On November 1, 1956 the Southern and most of the defendant labor organizations entered into an agreement which included a provision that until November 1, 1959 neither party would request any change in rates of pay, holidays, vacations, or the amount of payments for health and welfare insurance. Similar agreements were made with the remain-

ing defendant labor organizations. Said "Moratorium" provision was not only limited as above described but also specifically excepted requests concerning stabilization of employment and a number of other subjects.

6. On or about May 22, 1958 each of the defendant labor organizations served upon plaintiffs identical notices pursuant to section 6 of the Railway Labor Act, of their desire to amend existing agreements in accordance with eight proposals. The proposals were as follows:

"1. All positions within the scope of the rules and working conditions agreement between the Carrier and the Signatory Organization which were in existence on March 22, 1957 and which have been abolished or have become vacant, or the incumbents of which have been furloughed, shall immediately be restored and shall be filled in accordance with the applicable rules of said agreement. Thereafter no position within the scope of said agreement shall be abolished, or allowed to remain vacant, or the incumbent thereof be furloughed except after conference and agreement between the representative of the Carrier and the General Chairman of the Signatory Organization.

"2. Notwithstanding the provisions of any agreement heretofore made, no work within the scope of the rules and working conditions agreement between the Carrier and the Signatory Organization shall under any circumstances be performed by any official, supervisory officer or employee or any other person not employed under said agreement. Supervisory employees covered by any rule of said agreement but excepted from some rules of said agreement shall perform only supervisory duties. In case of any violation of this rule the employee or employees who would have performed such work if such work had been performed without violation of this rule shall be compensated on the same basis as if he or they had performed the work.

"3. No work which, if it were performed by the Carrier with its employees, would be within the scope of the rules and working conditions agreement between the Carrier and the Signatory Organization shall be performed otherwise than by the Carrier with employees employed under said agreement except pursuant to a special agreement made in each instance between the representative of the Carrier and the General Chairman of the Signatory Organization for the performance of specifically described work through an independent contractor. In case of any violation of this rule the employee or employees who would have performed such work if such work had been performed without violation of this rule shall be compensated on the same basis as if he or they had performed the work.

"4. No disciplinary action of any kind shall be taken against any employee employed within the scope of the rules and working conditions agreement between the Carrier and the Signatory Organization except in accordance with the following rules:

"(a) Within five calendar days after the alleged offense the employee and the representative of the Signatory Organization will be furnished written charges specifically describing in detail the alleged offense and the time and place of its alleged commission. The employee shall be afforded a full and fair hearing on such charges within ten calendar days after charges are served or within such further time as may be agreed upon between the carrier and the employee or his representative. The employee's representative shall be entitled to participate in the hearing and in any investigation preliminary thereto or to the serving of charges together with such other persons as such representative may deem desirable for the protection of the employee's in-

terests, and the employee and his representative shall be furnished with copies of the transcript of the proceedings. Such hearing, and any investigation preliminary thereto or to the serving of charges, shall be held only at the headquarters or home terminal of the employee involved.

"(b) Any penalty or discipline imposed shall be based solely on the proven facts established at the hearing with respect to the offense specified in the charges and shall not be more severe than is commensurate therewith. Any such penalty or discipline shall be subject to appeal in accordance with the rules of the rules and working conditions agreement between the Carrier and the Signatory Organization.

"(c) In no case shall a penalty be imposed more than twenty-five calendar days after the alleged offense unless such period is extended by agreement between the representative of the Carrier and the representative of the Signatory Organization.

"(d) Any employee involved in disciplinary proceedings and any employee participating in such proceedings shall be compensated by the Carrier for all time spent and expenses incurred in connection therewith. Time so compensated shall include time lost from work, time (other than that included in time lost from work) spent in attendance at such proceedings together with time spent in going to and returning from the proceedings, and all time the employee involved is held out of service pending final decision in the proceedings. Compensation for such time shall be computed under the applicable rules of the rules and working conditions agreement, considering such time as time worked.

"5. Employees employed under the scope of the rules and working conditions agreement between the Carrier and the Signatory Organization shall be required to take physical examinations only under the following rules:

"(a) The employee shall be compensated by the Carrier for all time spent and expenses incurred in connection therewith. Time so compensated shall include time lost from work, time (other than that included in time lost from work) spent in attendance at such physical examination together with time spent in going to and returning from such examinations, and all time the employee is held out of service pending final determination of his physical qualifications. Compensation for such time shall be computed under the applicable rules of the rules and working conditions agreement, considering such time as time worked.

"(b) If the examiners designated by the Carrier for a physical examination find the employee disqualified for any service he would otherwise be entitled to perform under the rules and working conditions agreement the employee shall have the right to secure an independent examination by a physician or surgeon of his choice and to submit the report of such examination to the examiners who made the examination for the Carrier. If the report so submitted disagrees with the findings of the examiners designated by the Carrier and, after consideration of such report, the examiners designated by the Carrier still hold that the employee is disqualified for any service he would otherwise be entitled to perform, the physician or surgeon chosen by the employee shall join with the examiner representing the Carrier in selecting a disinterested qualified examiner to make an independent examination, including proper field tests when requested, and the findings of such independent examiner shall be final and binding. All expenses incurred by the employee in any examination provided for in this

paragraph shall be reimbursed by the Carrier.

"(c) Nothing in this rule shall be taken to imply any right of the Carrier to require physical examination of employees not now subject to such examination.

"6. All communications governing the movement of trains shall be by train order issued by a trick train dispatcher and delivered to train and engine crews by the appropriate employee employed under the Carrier's rules and working conditions agreement with the representative of Station, Tower and Telegraph Employees. No train order shall be countermanded or modified by radio or any other means except by a superseding train order handled as required by this rule. All communications reporting upon the movement or expected movement of trains or governing the movement of other track vehicles shall be handled in writing and only by and through employees authorized to handle train orders under this rule. In any case of violation of this rule all employees who would have handled the communication had this rule been observed and all employees who were required to handle a communication in violation of this rule shall be paid an additional day's pay at the rate of his position.

"7. The Carrier will establish by agreement with the representative of the Signatory Organization regular periodic dates not less frequent than once each month for the consideration in conference and the adjustment of claims and grievances and disputes growing out of the interpretation or application of agreements. Upon the request of the authorized representative of the Signatory Organization or Organizations, at any time and from time to time, the Carrier will join with the Organization or Organizations in the establishment of a special board of adjustment to decide such disputes growing out of unadjusted claims

or grievances or out of the interpretation or application of agreements as the authorized representative of the Signatory Organization or Organizations may designate in his or their request. The time within which such special board of adjustment shall function shall also be as designated by the authorized representative of the Signatory Organization or Organizations in his or their request.

"8. The foregoing rules shall supersede any rules of existing agreements not consistent therewith, except that each Organization individually reserves the option to retain its existing rule on the same subject in lieu of the rule resulting from the negotiations on any of the foregoing proposals."

7. The above proposals had been drafted by some seven members of the Railway Labor Executives Association, a voluntary association of the chief executives of the standard railway labor organizations, the sixth proposal being drafted by the chairman of the association, Mr. George Leighty, president of the Order of Railroad Telegraphers, assisted by his counsel.

8. The Southern took the position that the first six of said proposals were barred by the moratorium provision of November 1, 1956 and similar agreements. The Southern took the position also that proposals one, four, five, six, and seven were proposals concerning which it was not required to bargain. Negotiations and mediation proved fruitless.

9. On September 2, 1958, Mr. G. E. Leighty, as Chairman of the Railway Labor Executives Association, gave notice that a strike date had been set by all of the organizations for September 8, 1958. When the Mediation Board proffered its services, the threatened strike was not called. On June 29, 1960, the Board closed its file because the defendants' uniform notices of May 22, 1958, had been withdrawn on November 16, 1959, after the expiration of the moratorium period, in order to eliminate further controversy over plaintiffs' position that

said proposals of May 22, 1958 were in violation of the moratorium agreement.

10. Also on November 16, 1959 the defendant organizations re-served the identical proposals upon plaintiffs, and the letters re-serving said identical proposals also stated that each defendant organization had "joined with other organizations serving a like notice * * * in the creation of an Employees' Conference Committee composed of the General Chairmen of the several organizations participating in this joint movement." Each defendant organization proposed that all be combined in one joint negotiation with plaintiffs. Two other labor organizations, American Train Dispatchers Association and the Brotherhood of Railroad Trainmen, had joined the defendants herein in serving the identical set of demands on May 22, 1958, but did not join in renewing the demands on November 16, 1959.

11. In response to the notices of November 16, 1959 the Southern on November 27, 1959 wrote defendant organizations that proposals one, three, six, and seven were proposals concerning which it was not required to bargain under the Railway Labor Act, abandoning such contention with respect to proposals four and five, and asserting such contention for the first time with respect to proposal three.

12. Plaintiffs' reply letters of November 27, 1959 to the defendant organizations also served individual and varying sets of counterproposals. In these replies plaintiffs, in addition to stating their position that four of the eight organization proposals—numbers one, three, six and seven—were outside the scope of mandatory bargaining, also stated that most of the organizations serving these identical demands had no lawful or legitimate interest in proposal number six. In addition, plaintiffs rejected the proposal that there be joint conferences with all of the general chairmen of the defendant organizations, pointing out in the letters to each individual chairman

"that there are vast and basic differences between our agreements with employees in different classes or crafts and that such diverse matters can be intelligently handled only in individual conferences with one craft at a time. Moreover, you are not designated or authorized to bargain on behalf of employees covered by agreements with other organizations, nor are General Chairmen of other organizations empowered to bargain on behalf of employees you represent."

13. Reserving the foregoing objections, plaintiffs agreed to separate meetings with the General Chairman of each organization. These discussions were to be "without prejudice" to plaintiffs' position that proposals one, three, six, and seven were not mandatory subjects of bargaining.

14. Meetings were scheduled and held by plaintiffs with the individual defendant organizations on various dates during December, 1959 and January-February, 1960. Despite plaintiffs' refusal to consider the separate interests of the different crafts in joint conferences, each General Chairman arrived at his organization's meeting with one or more General Chairmen of other defendant organizations. Plaintiffs stated that they were willing, if the Chairman concerned so desired, to have "General Chairmen of other organizations * * * sitting in as non-participating observers" and the meetings proceeded on this basis.

15. At these meetings, plaintiffs' representatives restated the position of plaintiffs, theretofore asserted in the abovementioned responses of November 27, 1959, that defendants' proposals numbered one, three, six and seven were outside the ambit of "rates of pay, rules, and working conditions" as those terms are used in the Railway Labor Act and were, therefore, not subjects for mandatory bargaining under the statute. At those meetings, and at all times thereafter, plaintiffs insisted that they would not bargain with respect to said four proposals, and plaintiffs have at all relevant

times down to this date adhered to this position and refused to bargain concerning said four proposals.

16. During the meetings in December, 1959 and January-February, 1960, defendant labor organizations diligently and persistently sought to induce plaintiffs to bargain with respect to the proposals numbered one, three, six and seven, insisted that plaintiffs were required to bargain with respect to said proposals, regardless of whether they fell within the ambit of rates of pay, rules or working conditions, and persistently claimed a right to seek to bargain with respect to said proposals regardless of whether plaintiffs were required to bargain with respect thereto. Defendant organizations have continued at all relevant times down to this date in all respects so to seek and insist.

17. At the end of two meetings between the plaintiffs and each of the separate organizations, it was stated by the persons in charge of the meetings for both sides that the business of these individual conferences remained incomplete, and that the conferences were accordingly to be considered recessed rather than concluded. It was understood that the conferences could be resumed upon the request of either party.

18. On March 22, 1960, Mr. G. E. Leighty, as "Chairman, Cooperating Railway Labor Organizations," (an *ad hoc* group in which defendant labor organizations combined for the purpose of seeking to bargain jointly with plaintiffs, and having no constitution or by-laws) wrote to the National Mediation Board stating that all the parties were at an impasse. He requested that all the separate negotiations "be docketed as one case and mediation be conducted concurrently with the Cooperating Railway Labor Organizations". (Joint Exhibit No. 88). In partial explanation of this request, Mr. Leighty referred to the position of plaintiffs on proposals one, three, six and seven, saying:

"With Management maintaining this adamant position, further direct negotiations on the property would be futile thus necessitating  *  *  * the mediatory services of your Board."

The letter also tendered as a proposed subject the refusal of plaintiffs "to hold joint conferences with the General Chairmen of the participating organizations on [the] uniform notice."

19. On or about April 1, 1960 the Southern took the position that the defendants' application for mediation was invalid and the Southern filed thirteen separate counter-applications for mediation, one with respect to each of the labor-organization defendants in these thirteen consolidated actions. The National Mediation Board docketed both the application of the labor organizations and the counter-applications of the Southern as Case No. A–6251.

20. Since Mr. Leighty's letter of March 22, 1960 to the National Mediation Board there have been no negotiations between plaintiffs and the individual organizations relating to the proposals or counterproposals herein discussed. There followed months of discussion and controversy over the appropriate bases and procedures for mediation. Through this period Mr. Leighty sought and plaintiffs resisted arrangements combining the separate negotiations into a joint movement.

21. The opposite and inflexible views held by plaintiffs and defendants prevented any effective mediation by the National Mediation Board and caused that Board to conclude that further mediatory efforts would be futile and to discontinue its efforts at mediation.

22. On December 16, 1962, the National Mediation Board, in accordance with Section 5, First, proffered arbitration to the parties and urged them to enter into an arbitration agreement.

23. On December 20, 1960 the Southern asked the Board to withdraw its proffer of arbitration and to conduct further mediation. Because of the pendency of this litigation, the Board has not acted upon that request and neither the Southern nor the defendant labor organizations

have accepted or rejected the proffer of arbitration.

24. Beginning at least as early as March 22, 1960, and ever since that date, defendant organizations have adamantly insisted that plaintiffs must bargain with respect to proposals one, three, six, and seven, despite plaintiffs' adamant insistence that these are not mandatory subjects for bargaining. Defendant organizations have also insisted adamantly throughout this period, again over plaintiffs' firm opposition, that bargaining be conducted jointly with all of them on their identical sets of eight demands.

25. The parties have at all material times been unable to agree as to whether defendants' proposals numbered one, three, six and seven are mandatory subjects for bargaining. It was stipulated, and the Court finds, that no evidence was necessary as to the meaning and effect of proposals one, three, and seven for purposes of resolving this issue of mandatory bargaining should the court reach that question. However, evidence was offered by, and received from, both sides with respect to proposal six, the plaintiffs contending and undertaking to prove that its subject matter is not a mandatory subject for bargaining and that it is of primary interest only to defendant Order of Railway Telegraphers, the other defendants having lesser and different interests or none at all in this proposal; and the defendants contending and undertaking to prove that this proposal six presents a mandatory subject for bargaining and that each defendant labor organization represents employees who are affected by and interested in it.

26. With respect to the proposals and counterproposals herein discussed there has been no strike vote; no strike date has been set, and defendants have not notified plaintiffs of any intention to strike.

### Conclusions of Law

After giving careful consideration to the evidence in this case, to the history and purposes of the Railway Labor Act, and to the proper applicability of the Declaratory Judgment Act this court is of the view (1) that this action does not present a justiciable controversy, (2) that this action does not present a situation appropriate for declaratory relief, and (3) that the dispute which the plaintiffs seek to have the court adjudicate has been, at least in its present posture, excluded by Congress from judicial determination.

1. While the legal principles underlying these three conclusions are not entirely separate, distinct and independent of one another and indeed are aclosely related the one to the other, perhaps they are sufficiently distinct to warrant separate listing.

The Constitution, Article III, Section 2, limits the exercise of the judicial power of the United States to "cases" and "controversies". The word "controversies", if distinguishable at all from the word "cases", is even less comprehensive than the latter. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239, 57 S.Ct. 461, 81 L.Ed. 617 (1937). A "controversy" in the constitutional sense means one that is appropriate for judicial determination.

> "A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. * * * The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. * * *"

There must be "a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged." 300 U.S. at 242, 57 S.Ct. at 464–465, 81 L.Ed. 617. "Claims based merely upon 'assumed potential invasions' of rights are not enough to war-

rant judicial intervention." Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 324, 325, 56 S.Ct. 466, 472, 473, 80 L.Ed. 688 (1936). See also Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 242, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

"It is well established that the courts will entertain only actual controversies between parties having adverse legal interests of certainty and immediacy, and will not judicially determine abstract questions or render a decree upon a hypothetical state of facts framed for the purpose of invoking the advice of the court without a real case. * * *" Taylor v. Brotherhood of Ry. & Steamship Clerks, etc., 106 F.Supp. 438, 442 (D.C., 1952).

■ If we assume what we do not need decide, that plaintiffs are not legally required to bargain about these proposals one, three, six and seven, and that they should not be required to consent to joint bargaining sessions, no legal rights of plaintiffs are violated by defendants' insistently requesting as of right that plaintiffs so bargain about these matters. N. L. R. B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). Plaintiffs are at liberty to decline such requests or to enter upon bargaining discussions without prejudice to their position. Defendants' further action in invoking mediation creates for plaintiffs no case or controversy. The fact that plaintiffs served counterproposals does not materially change the picture. No showing has been made that defendant organizations are unwilling to bargain with respect to the counterproposals albeit they adamantly insist upon bargaining also about their proposals. The gravamen of plaintiffs' grievance is not that defendants refuse to bargain as to the counterproposals but that defendants are insisting upon proposals one, three, six and seven and upon joint bargaining by defendant organizations' *ad hoc* group.

■ 2. Turning now to the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201 and 2202, we find that it of course adheres to the constitutional requirement that there be a "case" or "controversy." It requires "an actual controversy", the word "actual" being used for emphasis rather than definition. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, supra, 300 U.S. at 240, 57 S.Ct. at 463–464, 81 L.Ed. 617. We find under the cases too that judicial discretion should be exercised in deciding whether or not a declaratory judgment should be rendered. What was said by the Supreme Court in Public Service Commission of Utah v. Wycoff Co., supra, is particularly apposite here.

"But when all of the axioms have been exhausted and all words of definition have been spent, the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power. While the courts should not be reluctant or niggardly in granting this relief in the cases for which it was designed, they must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especially in the field of public law. A maximum of caution is necessary in the type of litigation that we have here, where a ruling is sought that would reach far beyond the particular case. Such differences of opinion or conflicts of interest must be 'ripe for determination' as controversies over legal rights. The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." 344 U.S. at 243, 244, 73 S.Ct. at 240–241, 97 L.Ed. 291.

The court said also:

"Even when there is no incipient federal-state conflict, the declaratory judgment procedure will not be used

to pre-empt and prejudge issues that are committed for initial decision to an administrative body or special tribunal any more than it will be used as a substitute for statutory methods of review." 344 U.S. at 246, 73 S.Ct. at 241–242, 97 L.Ed. 291.

Pertinent also is the holding of Johnson v. Interstate Transit Lines, 163 F.2d 125, 128, 172 A.L.R. 1242 (10th Cir. 1947).

"The essential distinction between a declaratory judgment action and the usual action is that in the former no actual wrong need have been committed or loss have occurred in order to sustain the action, but there must be no uncertainty that the loss will occur or that the asserted right will be invaded. If that is clearly established, one may proceed under the Declaratory Judgment Act and need not await the actual happening of the event complained of."

The Supreme Court had said earlier in Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941):

"Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

To grant the relief here requested would as I see it constitute a futile and immature intervention in a field of public law and would result in, a ruling reaching far beyond this particular case. The differences of opinion reflected in this suit are not ripe for determination but are too nebulous and contingent for present adjudication. There is considerable uncertainty as to whether any harm will ever result to plaintiffs. Compare Central of Georgia Ry. Co. v. Brotherhood of Locomotive Engineers, 191 F. Supp. 666 (M.D.Ga.1960). Speculative anticipation of a future course of action or mere forecasts and predictions of irreparable injury will not suffice. Taylor v. Brotherhood of Ry. & Steamship Clerks, Etc., 106 F.Supp. 438 (D.D.C. 1952).

While the courts have lent their aid to disputants by passing upon the validity *vel non* of a bargaining contract, Switchmen's Union v. Central of Georgia Ry. Co., 179 F.Supp. 217 (M.D.Ga.1958), aff'd 269 F.2d 726 (5th Cir. 1959), and while in a series of cases, where collective bargaining agents stepped outside their legal duties and violated the act which called them into being, such bargaining agents have been enjoined, Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 338 & n. 14, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), and while the courts have enjoined strikes in order to protect the jurisdiction of the National Railway Adjustment Board in minor disputes, Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), and have enjoined threatened and impending strikes in major disputes where good faith bargaining has not taken place in the manner and to the extent required by the act, Chicago, Rock Island & Pac. R. Co. v. Switchmen's Union, 187 F.Supp. 581 (W.D.N.Y.1960); Long Island R. Co. v. Brotherhood of R. R. Trainmen, 185 F. Supp. 356 (E.D.N.Y.1960); Pan American World Airways v. Brotherhood, etc., 185 F.Supp. 350 (E.D.N.Y.1960); American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777 (S.D.N.Y.1958), and while in non-labor cases it is a common function of courts by declaratory judgments to declare the rights of parties under a contract already in existence as *fait accompli* (the courts doing this also in labor cases, see Prudential Insurance Co. of America v. Insurance Agents' International Union, 169 F.Supp. 534 (S. D.N.Y.1959), and Capitol Airways, Inc. v. Air Line Pilots Ass'n, (M.D.Tenn. 1961), 223 F.Supp. 168), the courts have not generally treated as justiciable a controversy of the type and nature here presented. For instance, in cases like Switchmen's Union v. Central of Geor-

gia Ry. Co., supra, relief has been confined to a determination of the validity of a specific contract, and in other cases adjudication has been refused with respect to pronouncements, policies and programs of the parties. In Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, the Court said "[t]he judicial power does not extend to the determination of abstract questions", and summarized a prior ruling in United States v. West Virginia, 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546 (1935) as follows:

> "At the last term the Court held, in dismissing the bill of the United States against the State of West Virginia, that general allegations that the State challenged the claim of the United States that the rivers in question were navigable, and asserted a right superior to that of the United States to license their use for power production, raised an issue 'too vague and ill-defined to admit of judicial determination.'" 297 U.S. at 324, 56 S.Ct. at 472, 80 L.Ed. 688.

The court in the West Virginia case said further:

> "There is no support for the contention that the judicial power extends to the adjudication of such differences of opinion. Only when they become the subject of controversy in the constitutional sense are they susceptible of judicial determination." United States v. West Virginia, supra, 295 U.S. at 474, 55 S.Ct. at 793, 79 L.Ed. 1546.

3. This dispute has been, at least in its present posture, excluded by Congress from judicial determination. One of the landmark cases under the Railway Labor Act is General Committee of Adj. of B. L. E. for Missouri-Kansas-Texas R. Co. v. Missouri-K.-T. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943). The holding there was that where two labor organizations each claimed exclusive bargaining rights with a railroad company as to the demotion of engineers and promotion of firemen to emergency work, the issues tendered "are not justiciable * * * that is to say that Congress by this Act has foreclosed resort to the courts for enforcement of the claims asserted by the parties." 320 U.S. at 328, 64 S.Ct. at 148, 88 L.Ed. 76. While the Missouri-K.-T. R. Co. case is frequently appropriately distinguished by courts and counsel by labeling it a "jurisdictional dispute" case, the particular factual situation there in no way detracts from the broad legal principles there announced as they apply to the facts of this case. There as here parties duty bound by the Act to bargain in good faith were allegedly at an impasse and *bona fide* applied to the courts for a declaratory judgment declaring their rights and duties under the Act. There two unions and the carriers were involved in a triangular dispute, and to make matters worse the carriers were caught in a crossfire between the two unions. Certainly the parties there were as much in need of a declaration of their rights as here. The Court reviewed the history of the Act pointing out that by it Congress freely employed the traditional instruments of mediation, conciliation, and arbitration and left those instruments as well as the availability of economic weapons unchanged in large areas of the railway labor field and that on only certain phases of this controversial subject has Congress utilized administrative or judicial machinery and invoked the compulsions of the law. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S. Ct. 592, 81 L.Ed. 789 (1937), was reviewed and construed as not implying that every representation problem arising under the Act presents a justiciable controversy albeit there may be many areas in this field where neither the administrative nor the judicial function can be utilized, which is "only to be expected where Congress still places such great reliance on the voluntary process of conciliation, mediation and arbitration". General Committee of Adj. of B. L. E. for Missouri-Kansas-Texas R. Co. v. Missouri-K.-T. R. Co., supra, 320 U.S. at 337, 64 S.Ct. at 152–153, 88 L.Ed. 76.

The court said:

"In short, Congress by this legislation has freely employed the traditional instruments of mediation, conciliation and arbitration. Those instruments, in addition to the available economic weapons, remain unchanged in large areas of this railway labor field. On only certain phases of this controversial subject has Congress utilized administrative or judicial machinery and invoked the compulsions of the law. Congress was dealing with a subject highly charged with emotion. Its approach has not only been slow; it has been piecemeal. Congress has been highly selective in its use of legal machinery. The delicacy of these problems has made it hesitant to go too fast or too far. The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate." 320 U.S. 332, 333, 64 S.Ct. 150–151, 88 L.Ed. 76.

" * * * [T]he conclusion is irresistible that Congress carved out of the field of conciliation, mediation and arbitration only the select list of problems which it was ready to place in the adjudicatory channel. All else it left to those voluntary processes whose use Congress had long encouraged to protect these arteries of interstate commerce from industrial strife. The concept of mediation is the antithesis of justiciability." 320 U.S. at 337, 64 S.Ct. at 152–153, 88 L.Ed. 76.

Appropriately the court of appeals for this circuit in Order of Ry. Conductors & Brakemen v. Switchmen's Union, 269 F.2d 726, 734 (5th Cir. 1959) refers to "the limited role which the judiciary plays in these railroad labor disputes."

■ The courts should think hard and long before undertaking to pass upon all differences of opinion which arise in bargaining conferences between the representatives of management and labor. In my judgment the Railway Labor Act contemplates no such recourse to the courts. As was stated in Northwest Airlines, Inc. v. Airline Pilots Association, 185 F.Supp. 77 (D. Minn. 1960):

"A naked declaration as to the rights of management to make management decisions would be a futile echo in solving the resulting practical problems which face the parties." 185 F.Supp. at 80.

It is highly problematical whether any useful purpose would be achieved by passing upon these parties' present contentions. A declaratory judgment today with respect to the four controversial proposals could result in a change in their phraseology and a request for a new declaratory judgment tomorrow. Even under the declaratory judgment act courts cannot render advisory opinions. Gardner v. Gardner, 98 U.S.App.D.C. 144, 233 F.2d 23 (1956); Brown v. Ramsey, 185 F.2d 225 (8th Cir. 1950).

One court has gone so far as to say:

"A 'declaratory judgment' should settle the entire controversy; that cannot be accomplished in the present action and the Court should dismiss it." Koon v. Bottolfsen, 60 F. Supp. 316, 320 (D.C.1944).

It may be that plaintiffs are not entirely without recourse. Whether or not these four controversial proposals present subjects for mandatory bargaining, a question not now decided, bargaining does not have to be confined to statutory subjects. N. L. R. B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S. Ct. 718, 2 L.Ed.2d 823 (1958). It is the philosophy of the Act that discussion, bargaining and mediation will dissipate many problems. If these four proposals are as meritless as they appear to plaintiffs to be, they may well topple of their own weight in the light of discussion among the parties themselves, or in the light of further discussion in the mediation process. Furthermore, as counsel for defendants argue, said proposals may be modified or even withdrawn. Failing all this, and should defendant Broth-

erhoods persist in their insistence upon discussing said proposals, and should plaintiffs' worst fears materialize and a strike become imminent, it may be that plaintiffs may then seek an injunction if willing to assume the burden of proving that the defendants have not complied with their statutory duty to bargain in good faith. Chicago, Rock Island & Pac. R. Co. v. Switchmen's Union, 187 F.Supp. 581 (W.D.N.Y.1960); Long Island R. Co. v. Brotherhood of R. R. Trainmen, 185 F.Supp. 356 (E.D.N.Y.1960); Pan American World Airways v. Brotherhood, etc., 185 F.Supp. 350 (E.D.N.Y.1960); Northwest Airlines, Inc. v. Airline Pilots Association, 185 F.Supp. 77 (D.Minn. 1960); American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777 (S. D.N.Y.1958). Justice Harlan in his dissenting opinion in Borg-Warner, supra, said:

"A determination that a party bargained as to statutory or nonstatutory subjects in good or bad faith must depend upon an evaluation of the total circumstances surrounding any given situation. I do not deny that there may be instances where unyielding insistence on a particular item may be relevant consideration in the over-all picture in determining 'good faith,' for the demands of a party might in the context of a particular industry be so extreme as to constitute some evidence of an unwillingness to bargain." 356 U.S. at 359, 78 S.Ct. at 728, 2 L.Ed.2d 823.

And the court of appeals for the fourth circuit in Norfolk & P. B. L. R. Co. v. Brotherhood of R. R. Trainmen, 248 F.2d 34, 45 n. 6 (1957), said:

"Under the latter act [Labor Management Relations Act] bargaining from a legally erroneous premise may be held an unfair labor practice. * * * It may be that, without questioning the sincerity of their conviction of their legal rights, which they apparently now concede to have been erroneous, the bargaining did not satisfy the substantive requirement of negotiation imposed upon the Brotherhoods by the Act."

Plaintiffs rely upon the case of Akron, Canton & Youngstown R. R. Co. v. Barnes, 215 F.2d 423 (7th Cir., 1954), which of course with deference is not binding upon this court and, as defendants urge, has authority only insofar as it has innate persuasiveness. While the majority opinion lends considerable support to plaintiffs' contentions, the dissenting opinion detracts to some extent from its persuasiveness. As a practical matter the questions there presented were perhaps less nebulous than those here involved. There the question was whether the negotiations should cross over a well-defined line, getting into the new fields of an insurance and welfare plan and free transportation for the affected employees and their families, whereas perhaps the proposals here seek to broaden the scope of familiar bargaining areas. Then too, while, except as above indicated, the Akron case is not distinguishable from the case at bar as to justiciability in the Article III Section 2 sense, it is clearly distinguishable in the aspects of (1) immediacy of threatened injury and ripeness for declaratory judgment, and (2) the appropriateness of courts' exercising restraint until all voluntary processes of negotiation, conciliation and mediation have run their course. It will be seen that in the Akron case a strike vote had been taken and its results withheld. The court's majority saw "a threat of a nationwide strike". It will be noted also that after the National Mediation Board had exhausted its statutory functions the President had created an Emergency Board. The immediacy, the imminence, the ripeness were all more apparent than in the case at bar.

I find it unnecessary and inappropriate to reach the other questions

(1) whether the four controversial proposals are proposals concerning rates of pay, rules or working conditions within the meaning of the Act.

(2) If they are not are plaintiffs nevertheless under obligation under the Act to bargain about them?

(3) Are defendant organizations entitled to proceed with joint bargaining as they insist upon?

(4) Does the Norris-La Guardia Act proscribe an injunction in this type case if an injunction would otherwise be proper?

## ORDER

In line with the foregoing all prayers of the complaints as amended are hereby denied and the complaints are hereby dismissed at the cost of the plaintiffs.

So ordered.