413 F.2d 19
 71 L.R.R.M. (BNA) 2522
 BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al., Appellants,
v.
SEABOARD COAST LINE RAILROAD COMPANY et al., Appellees.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al., Appellants,
v.
SEABOARD COAST LINE RAILROAD COMPANY et al., Appellees.
 Nos. 26043, 26044.
 United States Court of Appeals Fifth Circuit.
 June 4, 1969.
 
 Thomas W. McAliley, Beckham & McAliley, Neal P. Rutledge, John H. Wolf, Miami, Fla., for appellants.
 Allan Milledge, Milledge & Horn, Richard L. Horn, Miami, Fla., John W. Weldon, Edward A. Charron, Jacksonville, Fla., for appellees.
 Before THORNBERRY and DYER, Circuit Judges, and KEADY, District Judge.
 DYER, Circuit Judge:
 
 
 1
 The Brotherhood of Locomotive Firemen and Enginemen (Firemen) and the Brotherhood of Locomotive Engineers (Engineers) had a history of tripartite collective bargaining negotiations and agreements with the Atlantic Coast Line Railroad Company (ACL). The ACL later merged with the Seaboard Air Line Railroad Company (SAL), which had no such history of tripartite agreements, to form the Seaboard Coast Line Railroad Company (Seaboard). In anticipation of the merger, both unions separately entered into employee protective agreements, providing for the merger and consolidation of collective bargaining agreements existing on the constituent railroads through negotiations covering all employees of the merged company in each craft. These companion appeals present the question of whether following the merger, tripartite negotiations by the Firemen, the Engineers and Seaboard were required. We hold that the Engineers and Seaboard coulc bilaterally negotiate an agreement relating to the consolidation of seniority rosters for engineer employees and affirm.
 
 
 2
 Prior to the merger, both the Firemen and the Engineers had collective bargaining agreements (Schedule Agreements) with ACL regulating wages, rules and working conditions for their respective crafts. Portions of the Engineers' Schedule Agreement were tripartite in nature, with the Firemen having participated in negotiations and agreed to the terms.[1] Changes in these provisions required thirty days' notice to each of the other parties with further handling in conformity with the procedures of the Railway Labor Act, 45 U.S.C.A. 151 et seq. Incorporated into the Engineers' Schedule Agreement with ACL was a mediation agreement between the unions and the ACL from which no party could withdraw without the consent of the other two.[2]
 
 
 3
 Both unions had complementing collective bargaining agreements with SAL, although these agreements were not not tripartite. On the SAL the Engineers had separate yard and road seniority rosters, with the Firemen having a like distinction in their rosters.
 
 
 4
 The merger of ACL and SAL into Seaboard wended its way through the Interstate Commerce Commission and the courts over a period of seven years.[3] In approving the merger in 1963, the ICC prescribed, as required by 49 U.S.C.A. 5(2)(f),[4] minimal employee protective conditions similar to those imposed in other mergers. The Firemen, Eigineers, ACL and SAL, however, entered into separate employee protective agreements, authorized by section 5(2)(f), which provided greater employee protections than those imposed by the ICC. On November 3, 1966, the Firemen, represented along with seventeen other unions by the Railway Labor Executives' Association, entered into an Agreement for Protection of Employees in Event of Merger of SAL and ACL (Firemen's Protecitve Agreement), which had been negotiated with representatives of both SAL and ACL. One week later, the Engineers separately entered into a nearly identical protective agreement (Engineers' Protective Agreement) with the two railroads.
 
 
 5
 The purpose of the two protective agreements was 'to prescribe the procedures by which existing agreements between the parties shall be modified and consolidated to conform with the changes in services, facilities and operations involved in such merger.' In nearly identical terms the protective agreements provided for the consolidation of seniority rosters according to craft through negotiations covering all employees of the merged company in each craft. The Firemen's Protective Agreement provided that the existing ACL and SAL
 
 
 6
 agreements will be merged into new agreements through negotiations covering all employees of the Merged Company in each craft with consolidation of seniority rosters and seniority districts for each class and craft of employees.
 
 
 7
 The Engineers' Protective Agreement provided that
 
 
 8
 such agreements will be merged into a new agreement through negotiations covering all employees of the Merged Company in each craft with consolidation of seniority rosters and seniority districts for engineers.
 
 
 9
 Both protective agreements constituted separate contracts with the labor organization and railroads signatory to them. In addition to requiring negotiations and consolidation of seniority rosters and districts, the protective agreements required Seaboard to 'take over and assume all contracts, schedules and agreements' between the constituent railroads and the labor organization.
 
 
 10
 The negotiations relating to fireman and engineer employees did not fare well, due to the close relationship of the two crafts. There is a high degree of intercraft mobility between firemen and engineers, with some individuals working as a fireman one day, an engineer the next, and a fireman again on the following day. Typically an individual holds seniority both as a fireman and as an engineer. The close relationship has stimulated frequent disputes over the years regarding the rules governing movement between the crafts such as rules governing the demotion of engineers, the return of demoted engineers to their work, the promotion of firemen to engineer, maximum mileage regulations and the like. Eventually these disputes have been resolved, as on the ACL through tripartite agreements or on the SAL through separate complementing agreements. The merger required their resolution again, since there were points of conflict in agreements both within one craft and between the two crafts on the two railroads. One subject of conflict was the consolidation of seniority districts and rosters, since on the SAL there was separate yard and road seniority for both firemen and engineers while on the ACL there was no such distinction.
 
 
 11
 Initially, Seaboard, the Firemen and the Engineers commenced three-way discussions in an attempt to arrive at mutually acceptable agreements for each craft. These proved unsuccessful, whereupon the Engineers and Seaboard commenced bilateral negotiations and eventually reached agreement. The Engineers and Seaboard agreed upon a new Schedule Agreement, redefining the rules, rates of pay and working conditions of engineers, and an Implementing Agreement, providing for the consolidation of seniority districts and seniority rosters. The Implementing Agreement provided for the consolidation of thirty-one seniority districts into six, with one seniority roster for each district.
 
 
 12
 The Engineers-Seaboard Schedul Agreement and Implementing Agreement were to go into effect January 16, 1968, but because of threatened litigation by the Firemen, implementation was delayed until January 23, 1968.[5] After the week of delay had passed, Seaboard still refused to implement its agreement with the Engineers, so on January 29, 1968, the Engineers brought suit in the United States District Court for the Middle District of Florida to compel Seaboard to place the agreement into effect. On the following day, January 30th, the District Court entered a preliminary injunction requiring Seaboard to implement the agreement.
 
 
 13
 On the same day that the preliminary injunction was entered, January 30th, the Firemen, who were unaware of the Engineers' suit in the Middle District of Florida, brought suit in the United States District Court for the Southern District of Florida seeking to enjoin the implementation of the Engineers-Seaboard agreement. Upon learning of the Engineers' suit, on February 1, 1968, the Firemen moved to intervene in the Engineers' suit against Seaboard in the Middle District. A hearing on the motion was held the next day, and on February 5, 1968, the District Court denied the motion for intervention, holding that the motion presented a jurisdictional dispute between the Firemen and the Engineers which the National Mediation Board, not a district court, has exclusive jurisdiction to resolve.
 
 
 14
 Thereafter in the Southern District, the Engineers and Seaboard moved to dismiss the Firemen's complaint for failure to state a claim upon which relief could be granted, lack of jurisdiction over the subject matter, and res judicata because of the Middle District's order denying intervention. A hearing on the motion to dismiss was held on February 8th, and on February 12th the District Court, without stating its reasons, granted the motion to dismiss with leave to amend. One motion later the Firemen filed notice of appeal from the order dismissing their complaint; then on March 19, 1968, they filed on Election to Stand on Original Complaint and Alternative Motion for Further Hearing or Entry of Final Judgment. The District Court obliged their last request by entering an order dismissing their complaint with prejudice, from which the Firemen on April 9th filed a second notice of appeal.
 
 
 15
 Preliminarily we dispose of the motion of the appellees to dismiss the appeal from the Southern District's case, No. 26,044. The appellees urge that the appeal should be dismissed as taken from a non-appealable order under the rule established in Bush v. United Benefit Fire Ins. Co., 5 Cir. 1963, 311 F.2d 893. The appellees construe Bush as holding that the District Court lacked jurisdiction to enter its second order of final judgment, from which notice of appeal also was filed, because of the pendency of appeal from the first non-appealable order. This construction is drawn by the appellees from the citation in Bush of Merritt-Chapman & Scott Corp. v. City of Seattle, 9 Cir. 1960, 281 F.2d 896, which the Ninth Circuit subsequently overruled in Ruby v. Secretary of United States Navy, 9 Cir. 1966, 365 F.2d 385. Reliance on Bush is misplaced, however, as it was merely held there that a certificate under Rule 54(b), Fed.R.Civ.P., could not make an interlocutory order final for the purpose of permitting an appeal. '(a) certificate of the trial judge under that rule cannot have the effect of conferring jurisdiction where none is given by statute or of withdrawing jurisdiction where the statute confers it.' King v. California Co., 5 Cir. 1955, 224 F.2d 193, 197, also cited in Bush, supra, 311 F.2d at 894 n. 1. In the instant case the appeal is before this Court on two notices of appeal, the first of which was premature and the second of which was proper. In such a circumstance we may simply strike the first notice and consider the appeal on the basis of the second. Cf. United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 177-178, 65 S.Ct. 254, 89 L.Ed. 160.
 
 
 16
 The appeal from the Southern District in large part depends upon the correctness of the Middle District's decision. The Firemen's Southern District complaint seeking an injunction against enforcement of the Engineers-Seaboard agreement was dismissed without expressing the reason upon a motion stating three related grounds for dismissal, i.e., failure to state a claim upon which relief could be granted, lack of jurisdiction over the subject matter and res judicata; each of which has a measure of validity.
 
 
 17
 The Firemen and the Engineers are the certified bargaining agents for their respective crafts. If the Engineers-Seaboard agreement related solely to engineers, the principle of exclusive representation would indicate that the Firemen could state no claim upon which relief against its enforcement could be granted. Since the crafts of engineer and fireman are interrelated, however, a more accurate statement of why relief could not be granted would be that the claim involves an inter-union representational dispute which district courts have no jurisdiction to resolve.
 
 
 18
 If the Middle District correctly denied the motion to intervene in the Engineers' suit, the Southern District's dismissal of the complaint was proper both on the ground of lack of jurisdiction, which was the Middle District's ground for denial of intervention, and on the ground of res judicata. The motion to dismiss and the motion to intervene were virtually identical, raising the same issues regarding a justiciable interest of the Firemen in the Engineers-Seaboard agreement. The principles of res judicata are applicable to fully litigated issues raised by a motion to intervene. Cheyenne River Sioux Tribe of Indians v. United States, 8 Cir. 1964, 338 F.2d 906, 911, cert. denied, 1965, 382 U.S. 815, 86 S.Ct. 34, 15 L.Ed.2d 62, and res judicata applies to the issue of jurisdiction, Hicks v. Holland, 6 Cir. 1956, 235 F.2d 183, cert. denied, 1956, 352 U.S. 855, 77 S.Ct. 83, 1 L.Ed.2d 66; cf. Brotherhood of Locomotive Firemen & Enginemen v. Louisville & Nashville R.R., 6 Cir. 1968, 400 F.2d 572 (Aug. 28, 1968), cert. denied, 1969, 393 U.S. 1050, 80 S.Ct. 689, 21 L.Ed.2d 692.
 
 
 19
 By challenging the validity of the Engineers-Seaboard agreement in their attempt to intervene in the Engineers' Middle District suit to enforce it, the Firemen seek to bring themselves within the narrow scope of judicial intervention in railway labor disputes. Judicial consideration of railway labor disputes is rare, particularly in representation disputes where the National Mediation Board has exclusive jurisdiction. Switchmen's Union of North America v. National Mediation Bd., 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61; General Committee of Adjustment v. Missouri-Kansas-Texas R.R., 1943, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76; General Committee of Adjustment v. Southern Pacific Co., 1943, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85. Although courts have jurisdiction to settle a dispute which poses a genuine issue as to the validity of a collective bargaining agreement, and not its interpretation, Order of Ry. Conductors & Brakemen v. Switchmen's Union of North America, 5 Cir. 1959, 269 F.2d 726, 729, and cases collected id. at n. 5, 'district courts have no such authority where 'validity' of the contract depends upon the merits of a representation dispute.' Division No. 14, Order of R.R. Telegraphers v. Leighty, 4 Cir. 1962, 298 F.2d 17, 20, cert. denied, 1962, 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287.
 
 
 20
 The Firemen contend that the Engineers-Seaboard agreement is invalid because it changes the subject matter of pre-merger tripartite agreements from which no party could withdraw without the consent of the Firemen or from which withdrawal could be accomplished only upon thirty days' notice and further proceedings under the Railway Labor Act. The Firemen argue that the subject matters of the pre-merger tripartite agreements were such that changes in their provisions inexorably affect both the Firemen and the Engineers. They assert that because their rights were fixed by the pre-merger agreements and both Seaboard and the Engineers were required to maintain pre-merger agreements in effect until changed following the merger, the rights of the Firemen under those agreements could not be altered through bilateral negotiations and agreements between the Engineers and Seaboard. Thus the Firemen claim the right to negotiate along with the Engineers and Seaboard regarding those matters covered by the pre-merger tripartite agreements, and that the bilateral agreement between the Engineers and Seaboard is invalid because the Firemen were neither a party to its negotiation nor have consented to it. We disagree.
 
 
 21
 While it well may be that the Firemen are entitled to negotiate regarding subjects of the Engineers-Seaboard agreement, the issue is not one for judicial consideration. The determination as to which labor organization may treat with a railroad regarding a particular issue because of 'an asserted overlapping of the interests of two crafts,' General Committee of Adjustment v. Missouri-Kansas-Texas R.R., supra, 320 U.S. at 334, 64 S.Ct. at 151, is a representational dispute within the exclusive jurisdiction of the National Mediation Board, whether the dispute is between two unions, id., or within the union, Division 14, Order of R.R. Telegraphers v. Leighty, supra, or following a merger, id.; Brotherhood of Ry. & Steamship Clerks v. United Air Lines, Inc., 6 Cir. 1963, 325 F.2d 576.
 
 
 22
 Although a district court at times may have jurisdiction to enjoin unilateral changes in the status quo established by collective bargaining agreements, Texas & New Orleans R.R. v. Brotherhood of Ry & Steamship Clerks, 1930, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, a merger by its very nature requires changes in the status quo. Were it otherwise, the employee protective agreements negotiated by both the Firemen and the Engineers would have been unnecessary. Here the merger required a consolidation of the rights of the Firemen and the Engineers on the constituent railroads, with a merger of conflicting rights of each union as against the merged railroad and vis-a-vis the other union. The Engineers have consolidated their prior agreements through a new agreement which on its face applies only to engineer employees, although it indirectly affects fireman employees. The negotiations through which the agreement was reached were held bilaterally, as the separate employee protective agreements by providing for negotiations 'in each craft' obviously contemplated and the principle of exclusive representation would seem to require. See Virginian Ry. v. System Federation No. 40, 1937, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789; Brotherhood of Locomotive Engineers v. Chicago & North Western Ry., 8 Cir. 1963, 314 F.2d 424, 431.
 
 
 23
 This Court cannot say that simply because portions of the subject matter of the Engineers-Seaboard agreement formerly were the subject matter of tripartite agreements they necessarily must remain the subject of tripartite negotiations following the merger. We can perceive no distinction between the jurisdiction of a district court to resolve a dispute over whether a particular subject matter is within the representational jurisdiction of one labor organization rather than another, and the jurisdiction of a district court to resolve a dispute over whether a particular subject matter is within the concurrent representational jurisdiction of two labor organizations. A district court has jurisdiction to resolve neither dispute, the exclusive forum being the National Mediation Board. Underlying the issue of whether the provisions of the Engineers-Seaboard agreement should be in a two-party or a three-party agreement, having been in bipartite agreements on the constituent railroad and tripartite agreements on the other prior to the merger, is the necessity of determining whether the provisions are within the jurisdiction of one union or the other or both, for the provisions are not beyond dispute within the jurisdiction of one bargaining representative or the other. Only the National Mediation Board has jurisdiction to resolve this underlying issue. Thus the asserted 'invalidity' of the Engineers-Seaboard agreement depends upon the determination of a jurisdictional dispute between two railway labor organizations, a matter which a district court has no jurisdiction to decide.
 
 
 24
 The Firemen's motion to intervene in the Middle District litigation constituted an attempt to litigate a jurisdictional dispute between two unions in a federal court and was properly denied for lack of jurisdiction. Stein v. Wirtz, 10 Cir. 1966, 366 F.2d 188; Bantel v. McGrath, 10 Cir. 1954, 215 F.2d 297; Rose v. Brotherhood of Ry. & Steamship Clerks, 4 Cir. 1950, 181 F.2d 944; Hobson v. Hansen, D.D.C.1968, 44 F.R.D. 18. The Firemen's Southern District complaint therefore was properly dismissed for lack of jurisdiction and as res judicata.
 
 
 25
 Affirmed.
 
 
 26
 THORNBERRY, Circuit Judge (dissenting).
 
 
 27
 The Firemen (Brotherhood of Locomotive Firemen and Enginemen) maintain that the implementation of the new contract between the Engineers (Brotherhood of Locomotive Engineers) and the railroad abrogates certain tripartite agreements and a formal Mediation Agreement entered into by both unions and the carrier. They argue that the federal courts have jurisdiction to decide the controversy because the railroad and the Engineers have thereby violated an express mandate of the Railway Labor Act. This is that agreements must be carried forward until changed in accordance with Section 2, Seventh and Section 6 of the Act, 45 U.S.C. 152, Seventh and 156. In the courts below, appellees successfully contended that the federal courts were without jurisdiction and that the new agreement consummated between them simply 'affects' the Firemen and those they represent. The majority of this Court has concluded that the Firemen's claim falls within the exclusive jurisdiction of the National Mediation Board and that the courts below were therefore without jurisdiction. Believing that the Firemen's claim falls within the jurisdiction of the federal courts, I respectfully dissent.
 
 
 28
 In concluding that the courts are without jurisdiction, the majority has characterized the controversy as a 'jurisdictional dispute,' which the Supreme Court has held to be within the exclusive jurisdiction of the National Mediation Board. General Committee of Adjustment v. Missouri-Kansas-Texas R. Co., 1943, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76; General Committee of Adjustment v. Southern Pacific Co., 1943, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85; accord, Switchmen's Union of North America v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61. The General Committee cases likewise involved disputes between the Engineers and the Firemen, each claiming authority to treat with the railroad on a particular issue. When the Firemen and the railroad entered into agreement on the disputed issue, the Engineers brought suit in the district court to set aside in the district on the ground that the railroad had violated the Railway Labor Act by bargaining with the wrong employee representative. See Section 2, Ninth, 45 U.S.C. 152, Ninth. The Court held that the federal courts were without jurisdiction to resolve the controversy, reasoning:
 
 
 29
 It is clear from the legislative history of 2, Ninth, that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees. However wide may be the range of jurisdictional disputes embraced within 2, Ninth, Congress did not select the Courts to resolve them. To the contrary, it fashioned an administrative remedy and left that group of disputes to the National Mediation Board.
 
 The Court further stated:
 
 30
 In view of the pattern of this legislation and its history the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforceable in the courts should be implied.
 
 
 31
 General Committee of Adjustment v. Missouri-Kansas-Texas R. Co., supra, 320 U.S. at 336-337, 64 S.Ct. at 152-153.
 
 
 32
 The typical jurisdictional or representation dispute is over control of membership and work and is characterized by an attempted invasion by one union into the province of another. 'It raises the question whether one collective bargaining agent or the other is the proper representative for the presentation of claims to the employer. It involves a determination of the point where the exclusive jurisdiction of one craft ends and where the authority of another craft begins.' General Committee of Adjustment v. Southern Pacific Co., supra, 320 U.S. at 343, 64 S.Ct. at 145. Or, it may involve 'an asserted overlapping of the interests of two crafts' necessitating 'a determination of the point where the authority of one carft ends and the other begins or of the zones where they have joint authority.' General Committee of Adjustment v. Missouri-Kansas-Texas R. Co., supra, 320 U.S. at 334-335, 64 S.Ct. at 151. There is no question, and the Firemen concede as much, that in the absence of the formal Mediation Agreement and tripartite agreements, the Firemen's claims of the right to be heard in bargaining, of the right to be a party to any agreement reached in certain areas between the Engineers and the carrier, and of the invalidity of any contract reached without them would present a jurisdictional dispute. It would involve 'an asserted overlapping of the interests of the two crafts' and would require an administrative determination whether the Firemen, the Engineers, or both, have authority to deal with the carrier on the disputed issues.
 
 
 33
 But the present controversy involves more. Unlike the General Committee cases,[1] the dispute centers around the Firemen's claim that the appellees have abrogated existing labor contracts they have entered with the Firemen. These agreements include a series of tripartite agreements and a formal Mediation Agreement regulating matters within the jurisdiction of both unions on the former ACL. The formal Mediation Agreement, A-1607, was the result of a a 'major dispute' between the parties wherein the National Mediation Board rendered its statutory services resulting in compromise between the carrier and the two unions. This became part of the Schedule Agreements the Engineers and the Firemen each had with the carrier and expressly provided:
 
 
 34
 This agreement shall become effective as of January 1, 1945 and remain in effect until changed in accordance with the Railway Labor Act, amended.
 
 
 35
 and further that:
 
 
 36
 None of the parties hereto may withdraw except with the consent of each of the other parties.
 
 
 37
 Other tripartite agreements between the ACL, the Firemen and the Engineers provided that they:
 
 
 38
 * * * shall remain in effect subject to the serving of thirty (30) days written notice by any party upon each of the other two parties, further handling to be in conformity with the Railway Labor Act, as amended.
 
 
 39
 These agreements, entered by the three parties under the auspices of the National Mediation Board, established the zones where the two unions have concurrent authority. The subjects of those agreements fall within the province of both unions. As to these subjects, the Board sponsored, and parties accepted, tripartite agreements.[2] The claims of the Firemen predicated upon these agreements do not require the adjudication of a jurisdictional dispute between the two unions because 'the zones where they have joint authority,' General Committee of Adjustment v. Missouri-Kansas-Texas R. Co., supra, 320 U.S. at 335, 64 S.Ct. at 151, have been authoritatively determined. No further administrative adjudication is required.
 
 
 40
 Rather, the Firemen's claims fall within the well-established jurisdiction of the federal courts to compel compliance with the procedures set forth by the Railway Labor Act for changing agreements affecting rates of pay, rules, or working conditions. See, e.g., Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen, 5th Cir. 1964, 336 F.2d 172, 179; Manning v. American Airlines, Inc., 2d Cir. 1964, 329 F.2d 32, 33; Railroad Yardmasters of America v. Pennsylvania Ry. Co., 3d Cir. 1955, 224 F.2d 226. Section 2, Seventh provides that 'No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in Section 156 (Section 6) of this title.' 45 U.S.C. 152, Seventh. Section 6 requires thirty days' written notice of 'an intended change in agreements' and proscribes changes in agreements pending the completion of the procedures of the Act.[3] See generally Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (U.S. March 25, 1969). Judicial intervention to enforce these explicit statutory commands is not incompatible with the Act's emphasis on conciliation, mediation, and arbitration, since its function is to compel the exercise of these voluntary processes. Consequently, the propriety of a judicial decree to insure that contracts under the Act remain in effect until the procedure for change has been exhausted is well established. Southern Ry. Co. v. Brotherhood of Locomotive Firemen and Enginemen, 1964, 119 U.S.App.D.C. 91, 337 F.2d 127, 132; Manning v. American Airlines, Inc., supra.
 
 
 41
 This Court's decision to that effect in Order of Ry. Conductors and Brakemen v. Switchmen's Union of North America, 5th Cir. 1959, 269 F.2d 726, is squarely in point. In that case, the Switchmen's Union had been duly certified as bargaining representative for the craft of yardmen on the carrier, thereby replacing the Trainmen in that capacity. The Switchmen gave the railroad a Section 6 notice to change the old Trainmen agreement and a new contract between the Switchmen and the carrier resulted. No Section 6 notice was given the Trainmen. The Trainmen (BRT) and Conductors (ORC & B) then brought suit and challenged the validity of the agreement formulated by the Switchmen and the railroad on the ground that the carrier had not served a Section 6 notice. This Court, as to jurisdiction of the lower court to consider such a controversy, wrote:
 
 
 42
 In a consolidated proceeding the District Court held the SUNA contract valid. BRT and ORCB appeal, contending that the agreement is invalid and its enforcement should have been enjoined. Admittedly no Section 6 notice was given by the Railroad to BRT and ORCB, and, if required, the contract is invalid, leaving the prior agreements (or practices) in effect. All are in agreement, with which we concur, that the case poses a genuine issue as to validity, not interpretation, so that on these and other authorities, it is one for judicial consideration.
 
 
 43
 Id., 269 F.2d at 728-729; accord, McElroy v. Terminal Railroad Assn., 7th Cir. 1968, 392 F.2d 966, 970. The same basis for jurisdiction is present here. The Firemen contend that the contested agreement alters the substance of agreements to which they are a party, that they were entitled to Section 6 notice of the contemplated changes, and that the new agreement is therefore invalid for want of notice and conference. It cannot matter that the Firemen's claim may fail on its merits; jurisdiction exists to decide the case either way.
 
 
 44
 Nor are the district courts without jurisdiction, as the majority suggests, because 'validity of the contract depends upon the merits of a representation dispute.' Division No. 14, Order or Railroad Telegraphers v. Leighty, 4th Cir. 1962, 298 F.2d 17, 20; Brotherhood of Ry. and Steamship Clerks v. United Air Lines, Inc., 6th Cir. 1963, 325 F.2d 576. The validity of the contract depends instead upon the requirement of a Section 6 notice of change. 'If required, the contract is invalid.' Order of Ry. Conductors and Brakemen v. Switchmen's Union of North America, supra, 269 F.2d at 728. Resolution of that issue may involve a determination of the scope and viability of the agreements the Firemen contend were unlawfully altered without notice and conference. But the adjudication of a representation dispute, as heretofore established, is not involved inasmuch as the zones where the two unions have joint authority have been defined in the agreements entered under the auspices of the Mediation Board. The district courts, in order to decide if the Firemen were entitled to notice, need only look to the tripartite agreements which the Firemen seek to preserve. In short, this case presents the same justiciable issues involved in any suit brought to compel compliance with the procedures set forth by the Act for the orderly change of agreements. It can make no difference that tripartite agreements between two unions and a carrier, rather than the typical bi-lateral agreements between a single union and a carrier, are involved. These plainly constitute 'agreements' within the meaning of Section 2, Seventh and Section 6. Therefore, it seems clear that if prior to the merger, the carrier (ACL) and the Engineers had changed the substance of the tripartite agreements, the Firemen could have challenged the validity of any new agreement in federal court.
 
 
 45
 The question remains whether the merger of the two carriers requires a different holding. Appellees contend, and the majority seems to agree, that the separate pre-merger employee protection agreements providing for negotiations 'in each craft' have superseded the tripartite agreements. The Firemen, it is argued, have contractually committed themselves to deal solely with the merged carrier in two-party negotiations, thereby wiping out their former right to tripartite negotiation and agreement. The Engineers and the carrier are likewise committed to two-party negotiations and agreement without the Firemen. It inevitably follows, therefore, that in claiming the right to confer with both the carrier and the other union, the Firemen have raised a jurisdictional dispute within the exclusive jurisdiction of the Mediation Board. Under this theory, the situation is the same that would have existed had there never been tripartite agreements. On the other hand, the premerger protection agreements, which allegedly supersede the former agreements, also provide that 'the Merged Company will take over and assume all contracts, schedules and agreements between Seaboard, Coast Line, and the labor organizations * * * and will be found by the terms and provisions thereof * * *.' This provision would appear to carry the old agreements forward until changed in the manner prescribed by the agreements or by the Act. Thus, while it is possible, as the majority suggests, that the protective agreements contemplated only two-party negotiations-- 'in each craft'-- and that the Firemen waived their rights to tripartite agreement, it is also possible that the old contracts are still viable. Either way, it is quite plain that this is a triable issue. The Firemen should not be shut out of court on the untried, unproven assumption (on the merits) that the formal Mediation Agreement and tripartite agreements died with the merger. On its face, the claim presented by the Firemen predicated on these agreements is justiciable. Their contentions at least warrant a finding by a lower court whether the Mediation Agreement and tripartite agreements are viable documents.
 
 
 46
 The appellees argue further that by virtue of the merger the procedures of the Railway Labor Act are inapplicable. The argument is that Section 5(11) of the Interstate Commerce Act, 49 U.S.C. 5(11), relieves the merged company from the restraints and limitations of the Railway Labor Act which would prevent effective consummation of the merger.[4] See Brotherhood of Locomotive Engineers v. Chicago & N.W. Ry. Co., 8th Cir. 1963, 314 F.2d 424. Accordingly, the Firemen's claims predicated upon the Railway Labor Act afford no ground for relief. The Firemen, on the other hand, emphasize that Section 5(11) of the Interstate Commerce Act limits the relief merged carriers have from other federal statutes to the extent 'necessary to enable them to carry into effect the transactions so approved.' Relief from the procedures set forth in the Railway Act for changing existing agreements, the Firemen argue, is not 'necessary' to the effectuation of the merger, and therefore Section 6 controls. See Texas & N.O. Ry. Co. v. Brotherhood of Railroad Trainmen, 5th Cir. 1962, 307 F.2d 151. But this issue, like that posed by the protection agreements entered prior to the merger, should be developed in one of the courts below in a trial upon the merits. See id. at 158.
 
 
 47
 In summary, I would hold that this controversy falls within the well-established jurisdiction of the federal courts to insure compliance with the procedure prescribed by the Railway Labor Act for changing agreements. The Courts are not required here to determine which of the two unions, if not both, the carrier is to treat with on the issues in dispute. The Mediation Agreement and the tripartite agreements entered under the auspices of the Mediation Board have resolved that question. A jurisdictional dispute, requiring adjudication of the bargaining authority of the two unions, is therefore not involved. Although the merger of the two carriers, as the majority seems to suggest, may vitiate the Firemen's claims, either because the tripartite agreements died with the merger or because the Interstate Commerce Act relieves the carrier of obligations imposed by the Railway Labor Act, this is an issue that should be developed in a trial on the merits.
 
 
 
 [1]
 The provisions related to the method of applying the mileage regulation of an engineer who during a given month worked both as an engineer and as a fireman, the penalty to be imposed when engineers or firemen failed to register the correct mileage, the method of calling demoted engineers for service when the engineers' extra list became exhausted and penalties to be imposed upon an employee who is out of place for call for service as an extra engineer, and the method to be used in returning engineers to the rank of fireman
 
 
 [2]
 The subject of the agreement, Mediation Agreement A-1607, was the maxium and minimum mileage to be accredited to the engineers' extra board
 
 
 [3]
 On May 19, 1960, the two railroads applied for merger with the Interstate Commerce Commission, and on December 13, 1963, the ICC approved the merger. 320 I.C.C. 122. A three-judge district court set aside the order approving the merger, Florida East Coast Ry. v. United States, M.D.Fla.1965, 242 F.Supp. 14, but the Supreme Court reversed and remanded the case to the district court, Seaboard Air Line R.R. v. United States, 1965, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223, which thereafter approved the merger, Florida East Coast Ry. v. United States, M.D.Fla.1966, 259 F.Supp. 993, aff'd, 1967, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285, which became effective July 1, 1967
 
 
 [4]
 Section 5(2)(c) of the Interstate Commerce Act, 49 U.S.C.A. 5(2)(c), requires the ICC in passing upon applications for mergers to give weight to various considerations, among which is 'the interest of the carrier employees affected.' Section 5(2)(f) of the Act states that:
 '(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.'
 
 
 [5]
 At the same time, certain individuals commenced litigation in Georgia and South Carolina state courts to prevent the agreements from going into effect. The ex parte restraining orders in those cases were eventually dissolved
 
 
 [1]
 Those cases did not involve the abrogation of existing agreements betwen the parties. Significantly, the Court stated:
 For many years the two Brotherhoods had an agreement which established rules and regulations on these subjects and which provided machinery for resolving disputes which might arise between them. This agreement was cancelled in 1927. The present dispute arose since that time * * *. General Committee of Adjustment v. Missouri-Kansas-Texas R. Co., supra 320 U.S. at 325-326, 64 S.Ct. at 147.
 
 
 [2]
 In view of the rights conferred upon the Firemen as a party to these agreements, the alternative theory advanced by appellees that the Firemen are without standing to contest the Engineer-carrier agreement is without merit. The new Engineer-carrier agreement allegedly abrogates the Firemen's rights under the tripartite agreements in violation of the Railway Labor Act, and therefore the new contract cannot be said to 'merely affect' the Firemen by virtue of the overlapping interests of the two crafts
 
 
 [3]
 Section 6, 45 U.S.C. 156 provides:
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by Section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.
 
 
 [4]
 Section 5(11), 49 U.S.C. 5(11) provides in pertinent part:
 The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power * * * to carry such transaction into effect * * * and shall be and they are relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved * * *.