INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN & HELPERS OF AMERICA (AIRLINE DIVISION), Plaintiff-Appellant,

v.

TEXAS INTERNATIONAL AIRLINES, INC., Texas Air Corporation & Continental Airlines, Inc., Defendants-Appellees.

No. 83–2103.

United States Court of Appeals, Fifth Circuit.

Sept. 27, 1983.

Rehearing Denied Oct. 27, 1983.

Roland P. Wilder, Jr., David J. Gzesh, Washington, D.C., Mullinax, Wells, Baab & Cloutman, Edward B. Cloutman, III, Dallas, Tex., for plaintiff-appellant.

Akin, Gump, Strauss, Hauer & Feld, John J. Gallagher, Margaret H. Spurlin, Charles L. Warren, Washington, D.C., for defendants-appellees.

Before INGRAHAM, RUBIN and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

An airline that had a collective bargaining agreement with a union affecting a number of its employees merged its operations with those of another airline with a substantially larger number of employees who worked in the same crafts but were not represented by a union. The airline then notified the union that the company no longer considered the union to be the collective bargaining agent for any of its employees. The union seeks a declaratory judgment that its collective bargaining agreement is still in force and will remain effective until another employee representative is certified. Because the National Mediation Board has exclusive jurisdiction of disputes involving the representation of airline employees, the union casts its complaint as a matter solely of determining the validity of its earlier collective bargaining agreement. Like the district court, we consider that the basic issue is determining who represents the hitherto covered employees after the merger and affirm the judgment dismissing the complaint for lack of jurisdiction, thus joining the Sixth Circuit. *Brotherhood of Railway and Steamship Clerks, etc. v. United Airlines, Inc.,* 325 F.2d 576 (6th Cir.), *appeal dismissed* 379 U.S. 26, 85 S.Ct. 183, 13 L.Ed.2d 173 (1963).

## I.

Collective bargaining between airlines and their employees is governed by the Railway Labor Act, 45 U.S.C. § 151 et seq., which was enacted to regulate labor relations on the nation's railroads and airlines. The Act seeks to prevent interruptions of service on these vital organs of interstate commerce. *See Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 726, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886, 1896 (1945). Its primary emphasis is on informal, cooperative methods of dispute resolution such as conciliation, mediation, and negotiation. Congress prescribed only a narrow role for the courts. *Id.* at 727, 65 S.Ct. at 1291, 89 L.Ed. at 1896.

The Act defines three classes of labor disputes: (1) "representation" disputes, which involve determining the representative of employees in collective bargaining and contract administration and the definition of the bargaining unit, the "craft or class" of employees to be represented; (2) "minor" disputes, which involve disagreements over the application or interpretation of existing collective bargaining agreements; and (3) "major" disputes, which involve disagreements over the formation of collective bargaining agreements.[1] The Act establishes a distinct resolution procedure for each class of dispute. "Minor" disputes are committed to a grievance—arbitration process before a system board of adjustment, which is the "mandatory, exclusive, and comprehensive system for resolving

1. *See Elgin J. & E. Ry. Co. v. Burley, supra,* 325 U.S. at 723, 65 S.Ct. at 1289, 89 L.Ed. at 1894; *Brotherhood of Railroad Trainmen v. Southern Railway Co.,* 393 F.2d 303 (5th Cir.1968).

grievance disputes." 45 U.S.C. § 184.[2] Neither federal nor state courts have jurisdiction to interpret labor contracts subject to the Act; that function is assigned exclusively to the system boards of adjustment. *Slocum v. Delaware, L. & W. R.R.,* 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950).

The resolution of major disputes is governed by Section 6 of the Act, 45 U.S.C. §§ 156, 181. Section 6 requires at least thirty days notice of either newly proposed contract terms or proposed changes in existing contract language, and then requires the carrier and the employee representatives to confer on the proposals. The mediation services of the National Mediation Board may be requested by either party, or may be provided by the Board on its own initiative. Once Section 6 procedures have been invoked, the status quo regarding rates of pay, rules, and working conditions must be maintained while bargaining continues even though the prior contract may have expired. It must also be maintained throughout mediation and for thirty days after the parties are "released" for self-help activities by the Board.[3] Following that thirty-day period, the parties are free to resort to self-help; the union may strike and the carrier may unilaterally change terms and conditions of employment.[4]

■ "Representation" disputes are governed by Section 2, Ninth of the Railway Labor Act, 45 U.S.C. § 152 Ninth, which provides that it is the duty of the Board to investigate any dispute as to who is the collective bargaining representative of employees and to certify the organization properly designated. A representation dispute may occur even if only one union

claims to represent the employees if there is a question whether a majority of the craft or class desires the union's representation.[5] Representation disputes include issues whether two related carriers will be treated as one for representation purposes,[6] and whether a craft or class must be system-wide or may be split for representation purposes.[7]

■ The scope of the Board's authority under the Act is not unlimited. The Board lacks authority to enforce contracts between carriers and unions. *Chicago & N.W. Ry. v. UTU,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). Nor may the Board determine the validity of those contracts or enforce the requirement that parties to a dispute maintain the status quo pending the results of the Act's dispute-resolution mechanism. *Pan American World Airways, Inc.,* 7 N.M.B. 168, 225 (1979). Additionally, the Board has "no adjudicatory authority with regard to major disputes nor has it a mandate to issue regulations construing the Act generally." *Detroit & Toledo S.L. R. Co. v. UTU,* 396 U.S. 142, 158–59, 90 S.Ct. 294, 304, 24 L.Ed.2d 325, 337 (1969).

We turn now to the factual situation.

## II.

Texas International, which was a subsidiary of Texas Air Corporation, operated an airline having 39 planes and 3,000 employees, 1,800 of whom were represented by the International Brotherhood of Teamsters. This union had been certified by the Board as the bargaining representative of Texas International's clerical, office, fleet, and passenger service employees in 1980, pursu-

---

**2.** *International Ass'n of Machinists v. Central Airlines, Inc.,* 372 U.S. 682, 687–89, 83 S.Ct. 956, 959–60, 10 L.Ed.2d 67, 71–73 (1963); *Brotherhood of Locomotive Engineers v. Louisville & N.R. Co.,* 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963).

**3.** *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344, 354 (1969).

**4.** *See Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n,* 306 F.2d 840, 845–50 (2d Cir.1962).

**5.** *See Summit Airlines, Inc. v. Teamsters Local 295,* 628 F.2d 787, 793 n. 3 (2d Cir.1980); Provincetown-Boston Airline Inc., 6 N.M.B. 29 (1976).

**6.** *E.g.,* Republic Airlines, Inc., 8 N.M.B. 49 (1980); New York Central R.R., 1 N.M.B. 197 (1941).

**7.** *E.g.,* Chesapeake & Ohio Ry., 9 N.M.B. 362 (1982); Union Pacific Railroad, 8 N.M.B. 434 (1981).

ant to Section 2, Ninth of 42 U.S.C. § 152, the Railway Labor Act, 45 U.S.C. § 151 *et seq.* A collective bargaining agreement between Texas International and the Union had been signed soon thereafter, to remain in force through January 31, 1983, with subsequent automatic annual renewals unless it was replaced in accordance with § 6 of the Act. 45 U.S.C. Section 156.

Through a series of stock acquisitions and corporation reorganizations, Texas Air Corporation acquired control of Continental Air Corporation which in turn acquired all of the stock of two airlines, Texas International and Continental. Continental had 10,000 employees and operated 79 planes. Four thousand of its employees work in the same crafts as those in which the Teamster-represented Texas International employees work. These Continental employees had not exercised their right to select a representative for purposes of collective bargaining.

The acquisition of Continental required approval by the Civil Aeronautics Board. As a condition of its approval, the Civil Aeronautics Board required Texas International to agree to labor protective provisions. These provisions require Texas International to pay a displacement allowance to all employees placed in lower paying jobs as a result of the merger, a dismissal allowance to employees whose jobs were eliminated, moving expenses to employees required to relocate, and to integrate seniority lists in "a fair and equitable manner." They require also that arbitration be available at the instance of any employee or group of employees to resolve any dispute relating to seniority integration or any other dispute about the application of the labor protective provisions.

In 1981, TI merged its operations into those of Continental, in effect forming a single airline called Continental, although the two companies preserved their separate corporate identities. The Union does not contend here that this operational merger was accomplished to escape the labor obligations of either company. *Cf.* Republic Airlines, Inc., 8 N.M.B. 49, 53–54 (1980)

(finding legitimate business purposes, not anti-union animus, motivated merger).

About a month before the operations of the two lines were integrated, Texas International's management notified the Union that on the merger date all of the employees in the crafts represented by the Union would become subject to Continental's employment policies and its agreement with the Union would no longer be effective. By that time the Union was the certified representative of only about 30% of the employees in the crafts or classes as merged. The Company recognized collective bargaining agreements with those other employee groups working in the merged operation that had previously been separately represented by the same unions; these unions represent pilots, dispatchers, and mechanics. Flight attendants had been represented by different unions, and the Company notified these two unions that it would honor the terms of both agreements.

The Union filed an application with the Mediation Board seeking certification as the representative of all employees of the merged airlines in the crafts for which it had been certified. It also notified Texas International and Continental, together now referred to as the Company, that it sought to negotiate any changes in the rates of pay, rules, and working conditions established by its collective bargaining agreement, invoking Section 6 of the Act. The Union then resorted to the district court, seeking a declaration that its collective bargaining agreement is valid and an injunction requiring the Company to comply with it and enjoining its violation.

■ The Union correctly contends that its complaint purports to seek only a declaration of contract validity. It relies on rulings both by the Supreme Court and this court that carriers cannot abrogate valid collective bargaining agreements, or change existing rates of pay, rules, or working conditions without complying with mandatory dispute-settlement procedures. *Detroit & Toledo Shore Line R. Co. v. UTU*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); *United Indus. Workers v. Galveston*

*Wharves,* 351 F.2d 183 (5th Cir.1965), *on appeal following remand,* 368 F.2d 412 (1966), *on appeal following second remand,* 400 F.2d 320 (1968), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). The carrier has a duty under the Railway Labor Act, Section 2 First, 45 U.S.C. § 152, First, to maintain agreements and the duty is enforceable by the district courts rather than the Mediation Board.

 These unquestionable principles do not erase other statutory precepts equally certain. The Act commits disputes involving a determination of who is to represent airline employees in collective bargaining to the exclusive jurisdiction of the National Mediation Board. A court may not entertain an action involving such a dispute even if it arises in the context of otherwise justiciable claims. *Switchmen's Union v. National Mediation Board,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *Brotherhood of Locomotive Firemen v. Seaboard Coast Line R. Co.,* 413 F.2d 19 (5th Cir.), *cert. denied,* 396 U.S. 963, 90 S.Ct. 432, 24 L.Ed.2d 426 (1969). Moreover, a court may not grant injunctive relief maintaining the status quo if the underlying dispute is representational in nature, because to do so would necessarily have the effect, at least during the period of the injunction, of deciding the representation issue. *Division No. 14, Order of R.R. Telegraphers v. Leighty,* 298 F.2d 17 (4th Cir.), *cert. denied,* 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962).

The Company did terminate an existing collective bargaining agreement. The agreement recites that it is between the clerical, office, fleet, and passenger service employees in the service of Texas International, as represented by the Union. The continuance in force of that agreement; however, inevitably entailed not only the enforcement of the rates of pay and conditions of employment set forth in it but also the requirement that the Company bargain with the Union concerning those matters, secure its consent to any changes and recognize the Union as the agent of the employees affected by the agreement, who now constitute a minority of the employees working in the same job classifications. It provides for a grievance procedure but that procedure requires attendance of the Union steward. If the grievance is not satisfied, the aggrieved employee must present a written grievance to the Union. Only if the Union determines that the grievance is valid can the initial decision be appealed. In accordance with the Railway Labor Act, it provides for a System Board of Adjustment, two members of which are appointed by the Union. Disputes must be submitted either by the Union or the Company's Vice President. If the System Board of Adjustment is not able to resolve the grievance, the Union may appeal the matter to arbitration. Thus, the Union has an indispensable role in administrating the agreement. It was indeed pursuant to the Union's recognition as collective bargaining agent that, on October 18, 1982, the Union wrote Texas International seeking negotiations under Section 6 of the Railway Labor Act for changes in rates of pay, rules, and working conditions of the Texas International employees represented by the Union. If the representation portions of the agreement had lapsed, then not only was this notice ineffective but there was no representative who could give a Section 6 notice.

 Enforcement of the contract, therefore, inescapably entailed the continuance of the Union's role as employee representative for the minority group, in accordance with its 1980 certification. Continuation of the contract in force unavoidably constitutes a determination of employee representation, and the conjunction of the two issues creates a conflict in principles, one dictated by the express statutory provision giving the Board sole jurisdiction over representation matters and the other implicit from the limited scope of the statute, that other disputes are reserved for judicial resolution.

The Sixth Circuit, under virtually identical facts, held that federal courts lack jurisdiction to adjudicate the enforceability of the collective bargaining agreement. *Brotherhood of Railway & SS Clerks v.*

*United Air Lines,* 325 F.2d 576 (6th Cir. 1963). The form of the complaint did not control, for the substance of the dispute in fact involved the question of representation of the employees. We have, under different facts, relied on similar reasoning, saying in *Brotherhood of Locomotive Firemen and Engineers v. Seaboard Coast Line Railroad,* 413 F.2d 19, 24 (5th Cir.1969):

> Although courts have jurisdiction to settle a dispute which poses a genuine issue as to the validity of a collective bargaining agreement, and not its interpretation, *Order of Ry. Conductors & Brakemen v. Switchmen's Union of North America,* 5 Cir.1959, 269 F.2d 726, 729, and cases collected *id.* at n. 5, "district courts have no such authority where 'validity' of the contract depends upon the merits of a representation dispute." *Division No. 14, Order of R.R. Telegraphers v. Leighty,* 4 Cir. 1962, 298 F.2d 17, 20, cert. denied, 1962, 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287.

To this we added: "Although a district court at times may have jurisdiction to enjoin unilateral changes in the status quo established by collective bargaining agreements, *Texas & New Orleans R.R. v. Brotherhood of Ry. & Steamship Clerks,* 1930, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, a merger by its very nature requires changes in the status quo." 413 F.2d at 24–25.

Judge Thornberry's dissent in *Seaboard* assumed the correctness of these principles.[8] He differed with the majority only because the employer and the two unions had reached an agreement, under the auspices of the Board and after a Section 6 notice, pursuant to an existing collective bargaining agreement.[9]

Other circuits, in analogous circumstances, have ruled that the district court has no jurisdiction to provide interim relief. In accord with the principle that, if a legal dispute also involves a representation question, a request for an injunctive order compelling the carrier to bargain in the face of competing representation claims was denied in *Ruby v. American Airlines, Inc.,* 323 F.2d 248 (2d Cir.1963), *cert. denied,* 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964). The Fourth Circuit refused to freeze competing representation claims pending the outcome of the Board's investigation in *Division No. 14, Order of R.R. Telegraphers v. Leighty,* 298 F.2d 17, 20 (4th Cir.), *cert. denied,* 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962). *See also ALPA v. Texas International Airlines, Inc. (New York Air),* 656 F.2d 16 (2d Cir.1981).

The statutory requirement that approval of a merger be obtained from the Civil Aeronautics Board is in part a recognition that a merger may create many problems apart from antitrust considerations. That agency's insistence on labor protective pro-

---

8. The dissent said:

 There is no question, and the Firemen concede as much, that in the absence of the formal Mediation Agreement and tripartite agreements, the Firemen's claims of the right to be heard in bargaining, of the right to be a party to any agreement reached in certain areas between the Engineers and the carrier, and the invalidity of any contract reached without them would present a jurisdictional dispute. It would involve "an asserted overlapping of the interests of the two crafts" and would require an administrative determination whether the Firemen, the Engineers, or both, have authority to deal with the carrier on the disputed issues.

9. The dissent concluded:

 In summary, I would hold that this controversy falls within the well-established jurisdiction of the federal courts to insure compli-

ance with the procedure prescribed by the Railway Labor Act for changing agreements. The courts are not required here to determine which of the two unions, if not both, the carrier is to treat with on the issues in dispute. The Mediation Agreement and the tripartite agreements entered under the auspices of the Mediation Board have resolved that question. A jurisdictional dispute, requiring adjudication of the bargaining authority of the two unions, is therefore not involved. Although the merger of the two carriers, as the majority seems to suggest, may vitiate the Firemen's claims, either because the tripartite agreements died with the merger or because the Interstate Commerce Act relieves the carrier of obligations imposed by the Railway Labor Act, this is an issue that should be developed in a trial on the merits.

visions is both a recognition of these problems and an effort to assure at least an interim solution. Upon a merger, a substantial number of new employees is added and the question of representation of those employees inevitably arises. At the time of a merger, it is as a practical matter impossible to look only to the existence of a collective bargaining agreement and to isolate it from the other operational and representational matters. The labor protective provisions are designed to protect all employees, whether or not hitherto represented by a union. Later airline-wide certification is not precluded, as indeed the Union's petition to the Mediation Board demonstrates.

The Mediation Board has itself adopted the rule that, upon a merger of two airlines, "all certifications ... were extinguished by operation of law." Republic Airlines, Inc. and Hughes Air Corp., 8 NMB 49 (1980). In reaching this conclusion, the Board noted that permitting certifications to survive a merger would lead to "uneven representation, duplication of effort, and confusion." 8 NMB at 54. It would reduce the ability of airlines to integrate operations and to maintain a single system. 8 NMB at 55. The Board would not foster such a pattern "in the absence of compelling facts, judged in each instance in a case-by-case consideration of the situation presented." Although this applies in terms only to union certification, the collective bargaining agreement reached as a result of a certification should not survive termination of the certification itself.

The Board has applied a similar rule in other cases.[10] Although these all involved conflicting union claims, we are unable to perceive sufficient reason to make a distinction between the situation in which separate unions represent employees of the two airlines that are wed in the merger and the one in which a union represents only one group of employees and the majority group is not represented. In either instance judicial interference is impractical.[11] One clerk would have a union representative; two of

his neighbors would be unrepresented. One employee's working conditions and grievance procedures would be governed by a collective bargaining agreement; two of his neighbors would not. We defer to the Board's rationale, based on the Board's expertise and the statutory delegation of authority to it, to determine disputes concerning who are the representatives of the carrier's employees. 45 U.S.C.A. § 152, Ninth.

The Union acknowledges that the operational merger between Texas International and Continental in October created a representation dispute among employees in the post-merger craft or class. It argues, however, that the Union's representative status, or lack of it, has nothing to do with the continued validity of the collective bargaining agreement. "This is because contract survival and the question concerning representation present legally distinct issues." In its brief, instead of urging that the entire agreement be enforced, the Union states that it asks "only that the carrier be required to observe the status quo; that it cease furloughing, transferring and firing Texas International employees wholesale; and that suitable remedies be devised for the total abrogation of employee contract rights." We are unable to perceive how the agreement can be thus dissected. It is not merely a contract negotiated by an agent on behalf of a group of principals, thereafter to be performed and enforced entirely by the principals. It recognizes the Union as the employee's bargaining agent. It delegates to the Union the right to enforce its provisions as the agent of the employees. By its terms the agreement is a *collective bargaining agreement* not a series of individual employment contracts. If the employees designate a new collective bargaining representative, it succeeds to the status of the former representative without alteration in the contract terms. *Air Transport Employees v. Western Airlines, Inc.,* 105 L.R.R.M. 3004, 3007, quoting National Mediation Board, *Forty-Second Ann. Report 39* (1976). The agreement cannot survive,

---

10. *See, e.g.,* Southern Airways, Inc., 6 N.M.B. 817 (1979).

11. *Brotherhood of Railway and Steamship Clerks v. United Airlines,* 325 F.2d at 578–79.

however, without some bargaining agent. The very character of this suit demonstrates that fact for suit is brought in the name of the Union itself.

Imparting to the judiciary jurisdiction to hold the contract enforceable and letting it then resolve the scope of the contract subject to the Board's determination of representation would be a superficially rational division of responsibilities.[12] There would, however, be no practical way to implement such a distinction. Jurisdiction would be vested simultaneously in two bodies. If the Mediation Board certified another representative, as the Union concedes it would have the power to do, the contract would terminate. In the meanwhile Union representation could only fill in the narrow space between the floor provided by the labor protective provisions and the ceiling set by the agreement. Judicial jurisdiction would not cease with a declaration of contractual validity but would inevitably be subject to an extension into the definition of that interstitial area. The limited scope of even the potential area for judicial action is indicated by the fact, stipulated to by the parties, that at most, 68 out of 1800 employees formerly represented by the Union were adversely affected by the merger. All of these employees were treated in accordance with their seniority and were offered, but declined, jobs that required relocation. Given the Mediation Board's undeniable sole jurisdiction over representation matters, we infer from the practical problems of divided jurisdiction a congressional intention to allow that agency alone to consider the post-merger problems that arise from existing collective bargaining agreements.

Our decision today is not contrary to our ruling in *United Indus. Workers v. Galveston Wharves, supra.* In that case, we ruled that an employer must comply with the Section 6 procedures before terminating operations at a public grain elevator and permanently laying off all of its operational employees. 351 F.2d at 190–92. Unlike the present case, in which the merger rendered the represented employees a minority, *Galveston Wharves* involved no question of the union's status as representative of a majority of the employees. The opinion considered only the company's unilateral change in the employees' working conditions.

A carrier does not have the power unilaterally to abrogate a collective bargaining agreement. So long as the operating unit is not dramatically altered by a merger that erases the Union's majority status, the Company must adhere to its compacts. After a merger that makes the employee group hitherto represented by the Union a minority of the craft, the question of employee representation inevitably arises. When this happens, resolution of that question is the function of the National Mediation Board.

For these reasons the judgment is AFFIRMED.

12. *Cf.* dicta drawing such a distinction in *International Association of Machinists v. Northeast Airlines, Inc.,* 536 F.2d 975, 978 (1st Cir.), *cert.* *denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 328 (1976).